Kenneth A. FOLKMAN, Sr., Debra J. Folkman and
Kenneth A. Folkman, Jr., Plaintiffs-Appellants,

v.

Sheri A. QUAMME, State Farm Mutual Automobile
Insurance Company and Keith A. Folkman,
Defendants,

SOCIETY INSURANCE, Defendant-Respondent-
Petitioner.

Supreme Court

*No. 02–0261. Oral argument March 4, 2003.—Decided
July 16, 2003.*

2003 WI 116

(Also reported in 665 N.W.2d 857.)

618

For the defendant-respondent-petitioner there were briefs by *James W. Mohr, Jr.* and *Mohr & Anderson, LLC,* Hartford, and oral argument by *James W. Mohr, Jr.*

For the plaintiffs-appellants there was a brief by *R. George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, and oral argument by *R. George Burnett.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals[1] that reversed a judgment of the Circuit Court for Brown County, Mark A. Warpinski, Judge. The circuit court dismissed Society Insurance (Society) from this action after determining that the automobile insurance policy that Society issued to Debra Folkman (Debra) limited the insurer's liability for bodily injury to $50,000 per accident, regardless of the number of insureds. The court of appeals reversed, finding that the "split liability limits" endorsement for bodily injury in Debra's policy was ambiguous when read in context with another portion of the endorsement. Given this perceived ambiguity, the court concluded that the policy's limits of liability should be read to apply separately to each insured's liability for bodily injury arising from a single accident, including vicarious liability from parental sponsorship. As a result, Society was required to tender $125,000 in fulfillment of its coverage obligations to the three members of the Folkman family who incurred liability for bodily injuries from an accident caused by the family's 17–year-old son.

¶ 2. We conclude that the insurance policy at issue in this case unambiguously limited Society's liability to $50,000 for bodily injury arising from this accident. The limits of liability provisions in the policy cannot reasonably be read, either alone or in the context of the entire policy, to grant liability coverage in an amount greater than $50,000 for a single accident in which only one insured was actively negligent. Accord-

---

[1] *Folkman v. Quamme,* 2002 WI App 237, 257 Wis. 2d 864, 652 N.W.2d 406.

ingly, we reverse the court of appeals and reinstate the circuit court's judgment dismissing Society from this action.

¶ 3. We are also asked to determine whether the insurance policy at issue violated a variety of Wisconsin statutes governing automobile insurance policies and whether the policy, as written, was illusory. We conclude that the limits of liability clause in Society's policy does not violate Wis. Stat. §§ 632.32(3)(b), 632.32(5)(f), or 641.43(1), is not illusory, and is enforceable.[2]

I

¶ 4. On the morning of April 11, 1998, 17–year-old Keith Folkman was driving a vehicle owned by his parents, Debra and Kenneth Folkman, Sr., when it collided with another vehicle. Debra and another son, Kenneth Folkman, Jr., were passengers in the car. The accident caused Debra to suffer severe injuries to both of her legs, her right shoulder, and her tailbone, and to lose hearing in her left ear. For these injuries, Debra incurred approximately $76,000 in medical expenses. Meanwhile, Kenneth Jr. became permanently paralyzed as a result of the accident.[3] Both Keith Folkman and Sheri Quamme, the driver of the other vehicle, were at

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[3] The amount of Kenneth Jr.'s bodily injury expenses, whether past, present, or future, is unclear from the record. However, because this action involves competing motions to establish the outer limits of Society's liability for this accident, it is not necessary, at this time, for a value to be attributed to these expenses. The Folkmans' attorney averred that the value of Debra and Kenneth Sr.'s claims exceeds Society's policy limits, whether such limits are $50,000 or $125,000.

fault for the accident, since Keith was speeding and Quamme failed to yield the right of way.

¶ 5. The car driven by Keith was insured under a Society Insurance "personal auto policy" issued to the policy's named insured, Debra Folkman. The policy also covered Kenneth Folkman Sr., Keith Folkman, and a third son, who was age 16, as drivers. Both of Keith's parents had sponsored Keith's license to drive. As a result, Society insured both Debra and Kenneth Sr. for sponsorship liability imputed to them by Keith's negligence.[4]

¶ 6. According to its declarations page, the policy included a "split limit of liability" for bodily injury of $25,000 for "each person" and $50,000 for "each occurrence."[5] The effect of the policy's limits of liability is explained in a section of the main policy labeled "Part A—LIABILITY COVERAGE." This section begins with Paragraph A of the "Insuring Agreement," which provides:

> We will pay damages for "bodily injury" or "property damage" for which any "insured" becomes legally responsible because of an auto accident. Damages include prejudgment interest awarded against the "insured." We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit

---

[4] Under Wis. Stat. § 343.15(1), when a person under age eighteen applies for a license, the application must be signed and verified by an adult sponsor. Under § 343.15(2)(b), any negligence of a person under eighteen in operating a motor vehicle is imputed to the person's parents, where both have custody and either signed as a sponsor.

[5] The declarations page also specifies that there is a $25,000 limit of liability for property damage for each occurrence. There is no issue regarding property damage liability in this appeal.

of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy.

An endorsement changed the fifth sentence of this paragraph to read: *"However, our duty to settle or defend any suit ends after our limit of liability has been offered or paid."*

¶ 7. Part A of the policy also includes a "Limit of Liability" section. Paragraph A of this section provides, in full:

LIMIT OF LIABILITY

The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one auto accident. This is the most we will pay regardless of the number of:

1. "Insureds;"[6]

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the auto accident.

This language in the policy's printed form was written to reflect a *single* limit of liability. Wisconsin Stat. § 344.33(2) requires that an automobile liability insurance policy issued in Wisconsin provide a minimum of $25,000 per person and $50,000 per accident in coverage for bodily injury. This statute usually produces "split limits of liability." These split limits of liability

---

[6] There is no dispute that Debra, Kenneth Sr., and Keith were "insureds" for purposes of liability coverage from the April 11, 1998, accident at issue in this case.

were noted on the declarations page and printed as a separate endorsement entitled "Split Liability Limits" that was added to replace Paragraph A and to explain the difference between the "per person" and "per occurrence" amounts. This endorsement, the language of which is at the heart of the case, is replicated as it appears in the policy as follows.

**SPLIT LIABILITY LIMITS**

**SCHEDULE**

| | |
|---|---|
| Bodily Injury Liability | $_____ each person |
| | $_____ each accident |
| Property Damage Liability | $_____ each accident |

The first paragraph of the Limit of Liability provision in Part A is replaced by the following.

**LIMIT OF LIABILITY**

The limit of liability shown in the Schedule or in the Declarations for each person for Bodily Injury Liability is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one auto accident. Subject to this limit for each person, the limit of liability shown in the Schedule or in the Declarations for each accident for Bodily Injury Liability is our maximum limit of liability for all damages for "bodily injury" resulting from any one auto accident.

The limit of liability shown in the Schedule or in the Declarations for each accident for Property Damage Liability is our maximum limit of liability for all "property damage" resulting from any one auto accident. This is the most we will pay regardless of the number of:

1. "Insureds;"

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the auto accident.

This endorsement must be attached to the Change Endorsement when issued after the policy is written.

¶ 8. After Society made several attempts to resolve its coverage obligations for the accident, Kenneth Sr., Debra, and Kenneth Jr. (the Folkmans)[7] jointly brought suit against Keith and Society, in addition to Quamme and her automobile insurer, to collect dam-

---

[7] Kenneth Sr., Debra, and Kenneth Jr. are the plaintiffs in this action and will be collectively referred to as "the Folkmans," unless it is necessary to identify them as individuals.

ages related to bodily injuries stemming from the accident. Society acknowledged Keith's responsibility for the accident and its resultant obligation to provide coverage. Accordingly, it filed a motion seeking to deposit $50,000 with the circuit court and then be dismissed from the action. Society reasoned that the $50,000 amount represented its full liability limit for the accident.

¶ 9. The Folkmans opposed the motion, contending that Debra's policy required Society to pay $125,000. They arrived at this figure as follows:

> (1) Keith had liability to Debra and Kenneth Jr., for a maximum of $25,000 to each of them;

> (2) Debra was liable to Kenneth Jr. as Keith's sponsor for a maximum of $25,000; and

> (3) Kenneth Sr. was liable to both Debra and Kenneth Jr. as Keith's sponsor, for a maximum of $25,000 to each of them.

The Folkmans argued that Society's $25,000 "per person" and $50,000 "per occurrence" limits of liability must apply separately to each of the three insureds. They sought a declaratory ruling that the foregoing were the correct limits of Society's obligation for liability coverage.

¶ 10. After the parties presented arguments, the circuit court construed the Folkmans' policy to limit Society's liability to $50,000 per accident, regardless of the number of insureds liable for that accident. In doing so, the court disposed of the Folkmans' various statutory arguments seeking to void the policy's limit of liability clause. Accordingly, the court denied the Folkmans' motion for a declaratory ruling and ordered that Society be dismissed from the action upon deposit of

$50,000 with the Clerk of the Circuit Court. Shortly thereafter, Society deposited $50,000 with the court and was formally dismissed.[8]

¶ 11. The Folkmans appealed. The court of appeals addressed only the issue of whether Society's policy was ambiguous as to whether multiple insureds share a single limit of liability under the policy. *Folkman v. Quamme,* 2002 WI App 237, ¶ 1, 257 Wis. 2d 864, 652 N.W.2d 406. The court of appeals held that Society's limits of liability for bodily injury were ambiguous when read in conjunction with another portion of the policy's split liability limits endorsement and, because of this ambiguity, the policy should be construed against the drafter, Society. *Id.,* ¶ 17. Consequently, the court determined that the policy's limits of liability should be read to apply separately to each insured's liability in a single accident and that Society was obligated to pay up to its limits of liability for each of the three insureds under the policy. *Id.* Society petitioned this court for review, which we granted.

II

¶ 12. Insurance contract interpretation presents a question of law that is reviewed de novo. *Danbeck v. Am. Family Mut. Ins. Co.,* 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150; *Smith v. Atl. Mut. Ins. Co.,* 155 Wis. 2d 808, 810, 456 N.W.2d 597 (1990). The same rules

---

[8] Two months later, by stipulation of the parties, Keith Folkman was dismissed, with prejudice, from the action. The record indicates that Quamme's automobile insurer had previously agreed to pay its policy limits of $150,000 to Debra and Kenneth Jr. in exchange for a *Pierringer* release from the action.

of construction that govern general contracts are applied to the language in insurance polices. *Kremers-Urban Co. v. Am. Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). An insurance policy is construed to give effect to the intent of the parties as expressed in the language of the policy. *Danbeck,* 245 Wis. 2d 186, ¶ 10.

¶ 13. Therefore, the first issue in construing an insurance policy is to determine whether an ambiguity exists regarding the disputed coverage issue. *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 51, 255 Wis. 2d 61, 647 N.W.2d 223. Insurance policy language is ambiguous "if it is susceptible to more than one reasonable interpretation." *Danbeck,* 245 Wis. 2d 186, ¶ 10. If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law. *Id.; Hull v. State Farm Mut. Auto. Ins. Co.,* 222 Wis. 2d 627, 637, 586 N.W.2d 863 (1998). If there is an ambiguous clause in an insurance policy, we will construe that clause in favor of the insured. *See Smith,* 155 Wis. 2d at 811.

### III

¶ 14. In one sense, this case concerns the amount that Society must pay the Folkmans in satisfaction of its liability insurance coverage for the bodily injuries suffered in Keith's automobile accident. The parties present varying amounts for Society's coverage obligations based on radically different interpretations of the policy. In particular, the parties contest the effect of the policy's "limits of liability" provisions, with Society arguing that the most it agreed to pay for liability

arising out of any one accident is $50,000 and the Folkmans contending that *each* insured is governed by his or her own $25,000/$50,0000 "limits of liability," for a total of $125,000. The resolution of this specific dispute will have ramifications on insurance coverage well beyond these litigants.

¶ 15. In another sense, this case is about the way courts interpret insurance policies. The case provides an opportunity to discuss ambiguity and the effect it has on insurance policy construction. We begin our discussion with a recitation of general principles.

¶ 16. Our goal in interpreting insurance contracts is to discern and give effect to the intent of the parties. *Sprangers v. Greatway Ins. Co.,* 182 Wis. 2d 521, 536, 514 N.W.2d 1 (1994). Insurers have the advantage over insureds because they draft the contracts. Thus, courts construe ambiguities in coverage in favor of the insureds and narrowly construe exclusions against insurers. *See Smith,* 155 Wis. 2d at 811.

¶ 17. As a general rule, the language in an insurance contract "is given its common, ordinary meaning," that is, " 'what the reasonable person in the position of the insured would have understood the words to mean.' " Arnold P. Anderson, *Wisconsin Insurance Law* § 1.1(C) (4th ed. 1998) (citing *Kremers-Urban,* 119 Wis. 2d at 735; *Richie v. Am. Fam. Mut. Ins.,* 140 Wis. 2d 51, 54, 409 N.W.2d 146 (1987)).

¶ 18. Some ambiguity is unavoidable because words are unable to anticipate every eventuality. But other ambiguity is the result of the insurer's imperfect preparation of the policy. A clearly written policy promotes a good relationship between the insurer and the

632

insured and protects the insured from future misunderstandings. The insurer's best defense against an unwarranted but appealing claim is an unambiguous policy.

¶ 19. Occasionally a clear and unambiguous provision may be found ambiguous in the context of the entire policy. *Dowhower v. West Bend Mut. Ins. Co.,* 2000 WI 73, ¶ 35, 236 Wis. 2d 113, 613 N.W.2d 557; *see also Frost v. Whitbeck,* 2002 WI 129, ¶ 18, 257 Wis. 2d 80, 654 N.W.2d 225; *Badger Mut. v. Schmitz,* 2002 WI 98, ¶ 37, 255 Wis. 2d 61, 647 N.W.2d 223; *Taylor v. Greatway Ins. Co.,* 2001 WI 93, ¶ 26, 245 Wis. 2d 134, 628 N.W.2d 916. Insurers dislike this principle. Yet, the opposite principle—that courts must mechanically apply a clear provision *regardless* of the ambiguity created by the organization, labeling, explanation, inconsistency, omission, and text of the other provisions in the policy—is not acceptable.

¶ 20. Courts will interpret the words of an insurance contract against the insured when the interpretation conforms to what a reasonable person in the position of the insured would have understood the words to mean. *McPhee v. Am. Motorists Ins. Co.,* 57 Wis. 2d 669, 676, 205 N.W.2d 152 (1973). But courts will not surrender the authority to construe insurance contracts in favor of the insured when a policy is so "ambiguous or obscure," *Maas v. Ziegler,* 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992), or deceptive that it befuddles the understanding and expectations of a reasonable insured.

¶ 21. There is a complementary principle to contextual ambiguity. Sometimes it is necessary to look

beyond a single clause or sentence to capture the essence of an insurance agreement. The language of a policy should not be made ambiguous by isolating a small part from the context of the whole. 2 Lee R. Russ & Thomas S. Segalla, *Couch on Insurance 3d* § 21:14 (3d ed. 1999 & Supp. 2002). Applying this principle, we conclude that the limits of liability in the Folkman policy regarding Society's coverage obligations are not ambiguous.

## IV

¶ 22. Last term, this court held in *Badger Mutual Insurance Co. v. Schmitz*, 2002 WI 98, 255 Wis. 2d 61, 647 N.W.2d 223, that a reducing clause in an automobile insurance policy affecting an insured's underinsured motorist (UIM) coverage became ambiguous when it was read in the context of the entire policy. *Id.,* ¶¶ 72, 75. We reached this conclusion even though the reducing clause itself was unambiguous when read in isolation and even though the clause was written in conformity with Wis. Stat. § 632.32(5)(i). *Id.,* ¶ 61.

¶ 23. In deciding the *Schmitz* case, three members of this court disagreed with the conclusion that the reducing clause at issue was ambiguous in relation to the operation of UIM coverage. *Id.,* ¶¶ 76–85 (Crooks, J., dissenting) (joined by Justices Wilcox and Sykes). However, the principle of ambiguity in context was not assailed by the dissent; it was embraced. *Id.,* ¶ 79 (Crooks, J., dissenting) ("I agree with the majority that *Dowhower* and *Taylor* recognized that language in an insurance policy can be ambiguous within the context of the whole policy.").

¶ 24. The principle of contextual ambiguity is established precedent. As a general matter, it has long been a rule of contract construction in Wisconsin that

"the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Sur. Co.,* 169 Wis. 2d 1, 9, 485 N.W.2d 217 (1992).[9] In *Dowhower,* decided in 2000, all seven members of this court applied this principle and agreed that "a reducing clause may be ambiguous within the context of the insurance contract." *Dowhower,* 236 Wis. 2d 113, ¶ 35. In that case, five members of our court voted to remand the action for consideration of whether the particular reducing clause was ambiguous within the context of the insurance contract, while two members of the court found the contract unambiguous and opposed remand. *Id.,* ¶ 35.[10]

¶ 25. The principle of contextual ambiguity was again recognized a year later in *Taylor v. Greatway Insurance Co.,* 2001 WI 93, ¶ 26, 245 Wis. 2d 134, 628 N.W.2d 916, another case involving UIM coverage. The

---

[9] *See also Crown Life Ins. Co. v. LaBonte,* 111 Wis. 2d 26, 36, 330 N.W.2d 201 (1983) ("It is a cardinal rule of contract construction that the meaning of a particular provision in a contract is to be ascertained with reference to the contract as a whole."); *Kraemer Bros., Inc. v. U.S. Fire Ins. Co.,* 89 Wis. 2d ·555, 562, 278 N.W.2d 857 (1979); *Ketay v. Gorenstein,* 261 Wis. 332, 333–334, 53 N.W.2d 6 (1952); *Hampton Plains Realty Co. v. Cohen,* 214 Wis. 128, 130, 252 N.W. 572 (1934) ("It is well established that in construing a particular provision of a written instrument the entire agreement must be looked to as a whole for the purpose of giving to each provision of the contract its intended meaning.") (citing cases).

[10] Although Justice Bradley ultimately joined in the mandate to remand, she wrote separately to explain her conclusion that the policy was ambiguous. *Dowhower v. West Bend Mut. Ins. Co.,* 2000 WI 73, ¶ 37, 236 Wis. 2d 113, 613 N.W.2d 557 (Bradley, J., concurring). Justice Bradley was joined in her concurring opinion by Chief Justice Abrahamson. *Id.,* ¶ 55.

majority, in holding that the insured was not entitled to UIM coverage under the circumstances of that case, stated:

> The definition of underinsured vehicle in American Family's policy *is unambiguous within the context of the entire policy.* We find nothing *in the rest of American Family's policy* that obscures the unambiguous definition of underinsured vehicle. . . . Because the definition of underinsured vehicle in each of American Family's policies is unambiguous standing on its own *and in the context of the whole policy,* we do not need to engage in construction to determine Taylor's reasonable expectations of coverage.

*Id.,* ¶ 27 (citing *Kremers-Urban,* 119 Wis. 2d at 735, 351 N.W.2d 156) (emphasis added).

¶ 26. *Dowhower, Taylor,* and *Schmitz* each involved UIM coverage in automobile insurance policies. The principle of contextual ambiguity may apply to other insurance contract provisions, but it came to the forefront in UIM cases because few areas of automobile insurance law have been so hotly contested and so vexing to courts. *See Dowhower,* 236 Wis. 2d 113, ¶¶ 22–31; *Schmitz,* 255 Wis. 2d 61, ¶¶ 25–34.

¶ 27. Society expresses concern that the principle of contextual ambiguity creates a slippery slope, opening up every insurance clause in a contract to reinterpretation in context. Society claims that it can never be certain where courts will "strike next" in finding contextual ambiguity and maintains that it will be faced with the impossible task of drafting perfect documents to avoid disruption of its intended insurance coverage. Society argues emphatically that clear language should be construed as it stands and that other portions of the policy should not be considered, unless the contested portion refers the insured to another part of the policy.

636

¶ 28. Society asserts that other states have not adopted the methodology this court followed in *Schmitz*. It presents the following language from the Supreme Court of North Dakota in support of this proposition:

> Generally, we attempt to ascertain the parties' intent through the language of the insurance contract itself. We look first to the language of the insurance policy, and *if the policy is clear on its face,* our inquiry is at an end. ...
>
> An ambiguity in an insurance policy exists when good arguments can be made for two contrary positions about the meaning of a policy term.

*Dundee Mut. Ins. Co. v. Marifjeren,* 587 N.W.2d 191, 193–94 (N.D. 1998) (emphasis added). This language does not mean that a clear phrase within a policy can never be rendered ambiguous by contradictory language elsewhere in the policy. We think the North Dakota high court is discussing how a policy that, *as a whole,* is clear on its face should not be rummaged through to unearth some type of latent ambiguity. Society has not cited any authority for the proposition that an otherwise clear insurance policy provision that is directly contradicted in another portion of the same policy will not be deemed ambiguous.[11] We would point

---

[11] To the contrary, courts from other states commonly, if not uniformly, recognize the possibility of contextual ambiguity for insurance policy provisions. *See, e.g., Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.,* 645 N.E.2d 1165, 1166–67 (Mass. 1995) ("we recognize that words, which are clear by themselves, may become ambiguous when read in the context of an insurance policy"); *Parker-Bigback v. St. Labre Sch.,* 7 P.3d 361, 368 (Mont. 2000) (finding contextual ambiguity in a contract); *State Farm Mut. Ins. Co. v. Pitman,* 809 A.2d 1280, 1282 (N.H. 2002)

to *Couch on Insurance,* which notes that "where a provision is subject to more than one interpretation, illogically located and labeled within the policy, and inconsistent with other provisions, it will be found to be ambiguous." Russ & Segalla, *supra,* § 21:14.

¶ 29. We agree with Society that any contextual ambiguity in an insurance policy must be genuine and apparent on the face of the policy, if it is to upset the intentions of an insurer embodied in otherwise clear language. The test for determining whether contextual ambiguity exists is the same as the test for ambiguity in any disputed term of a policy. That is, are words or phrases of an insurance contract, when read in the

("we address whether the application of the term ['accident'] in the context of uninsured motorist insurance is susceptible to more than one reasonable interpretation"); *Am. Family Mut. Ins. Co. v. Elliot,* 523 N.W.2d 100, 102 (S.D. 1994) ("Ambiguity in an insurance policy is determined with reference to the policy as a whole and the plain meaning and effect of its words."); *N. Sec. Ins. Co. v. Hatch,* 683 A.2d 392, 396–97 (Vt. 1996) ("It is common for ambiguity to arise in the context of different, but related, parts of an insurance policy."); *Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co.,* 26 P.3d 910, 924 (Wash. 2001) ("The reasonableness of the interpretations [to establish ambiguity in an insurance policy] is determined with regard to the contract as a whole.").

Of course, occasionally the principle of reading a policy in its entire context helps to alleviate any ambiguity that may exist in a provision when it is read standing alone. *See, e.g., Palmer v. Truck Ins. Exch.,* 988 P.2d 568, 575 (Cal. 1999) ("Where, as here, the meaning of the policy term is clear from the context of the policy as a whole, no ambiguity exists."); *Towns v. Vermont Mut. Ins. Co.,* 726 A.2d 65, 67 (Vt. 1999) ("ambiguity does not arise by isolating a word or phrase from the overall context of a contract").

context of the policy's other language, reasonably or fairly susceptible to more than one construction?[12] The standard for determining a reasonable and fair construction is measured by the objective understanding of an ordinary insured. *See Gen. Cas. Co. of Wis. v. Hills,* 209 Wis. 2d 167, 175, 561 N.W.2d 718 (1997) (citing *Sprangers,* 182 Wis. 2d at 536).[13]

¶ 30. The issue then is, what degree of contextual ambiguity is sufficient to engender an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language? On this matter we acknowledge an unintended effect of some language we used in *Schmitz.* In that decision, we summed up *Dowhower* as saying "that reducing clauses must be crystal clear in the context of the whole policy" for insureds to understand what they are purchasing. *Schmitz,* 255 Wis. 2d 61, ¶ 46. A series of court of appeals decisions decided post-*Schmitz* reveals that our

---

[12] *See, e.g., Dowhower,* 236 Wis. 2d 113, ¶ 34; *Sprangers v. Greatway Ins. Co.,* 182 Wis. 2d 521, 536–37, 514 N.W.2d 1 (1994); *Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414 (1975); *Wheelwright v. Pure Milk Ass'n,* 208 Wis. 40, 46, 240 N.W. 769 (1932) ("It is probably accurate to say that the language of a contract is ambiguous . . . when it may reasonably be taken in more than one sense.").

[13] We reject Society's argument that, in order for claims of ambiguity to go forward, there must be some credible evidence that an insured read the policy at issue and was reasonably confused about the policy language in question. We have long held that the test for ambiguity in an insurance contract is what a reasonable person in the position of the insured would have understood the words to mean. *See, e.g., Mau v. N.D. Ins. Reserve Fund,* 2001 WI 134, ¶ 13, 248 Wis. 2d 1031, 637 N.W.2d 45. This test is objective and one of law, not subjective and requiring a case-by-case factual finding of an insured's actual understanding.

admonition of "crystal clarity" has been used to alter the analytical focus.[14] Rather than assessing whether a policy, as written, is ambiguous in context, insurers are being required to undertake affirmative, explanatory responsibilities in drafting policies. Aspirational goals and admonitions on how to avoid ambiguity are admittedly different from minimum legal standards.

¶ 31. *Schmitz* and its predecessors do not demand perfection in policy draftsmanship. These decisions advise insurers to draft policies in a clear manner if they upset the reasonable expectations of insureds. To prevent contextual ambiguity, a policy should avoid inconsistent provisions, provisions that build up false expectations, and provisions that produce reasonable alternative meanings. These standards for clarity are consonant with Wisconsin law on ambiguity in insurance contracts. *See, e.g., Smith,* 155 Wis. 2d at 811; *see also Hause v. Bresina,* 2002 WI App 188, ¶ 8, 256 Wis. 2d 664, 649 N.W.2d 736 ("a policy is not ambiguous

---

[14] *See Gohde v. MSI Ins. Co.,* 2003 WI App 69, ¶¶ 6, 8, 261 Wis. 2d 710, 661 N.W.2d 470 ("Although a reducing clause may comply with the statute's language, the clause may still be unenforceable if its effect is not 'crystal clear in the context of the whole policy.'") (citing *Schmitz,* 255 Wis. 2d 61, ¶ 46); *Dowhower ex rel. Rosenberg v. Marquez,* 2003 WI App 23, ¶¶ 22–23, 260 Wis. 2d 192, 659 N.W.2d 57 ("*Schmitz* teaches us that in order for the policy to explain the effects of the reducing clause with crystal clarity, all of the provisions helping the insured navigate his or her way through the policy must be consistent with one another and with the reducing clause."); *Hanson v. Prudential Prop. & Cas. Ins. Co.,* 2002 WI App 275, ¶ 18, 258 Wis. 2d 709, 653 N.W.2d 915 ("Even if the reducing clause conformed to Wis. Stat. § 632.32(5)(i), it is not 'crystal clear' within the context of the whole policy.") (quoting *Schmitz,* 255 Wis. 2d 61, ¶ 46).

simply because the insured has offered a 'remotely possible second interpretation' ") (quoting *United States Fire Ins. Co. v. Ace Baking Co.,* 164 Wis. 2d 499, 503, 476 N.W.2d 280 (Ct. App. 1991)).

¶ 32. Ferreting through a policy to dig up ambiguity should not be judicially rewarded because this sort of ambiguity is insufficient. Rather, inconsistencies in the context of a policy must be material to the issue in dispute and be of such a nature that a reasonable insured would find an alternative meaning.

¶ 33. In analyzing contextual ambiguity, the policy must be taken as it is written. Society argues that the ambiguity-producing sentence attached to the paragraph addressing property damage in the policy's "split liability limits" endorsement could have been eliminated in its entirety, and the absolute $50,000 liability limit for each accident would remain abundantly clear. It argues that, since this case has nothing to do with property damage, this sentence should be ignored *if* it is construed to apply only to the property damage paragraph.

¶ 34. The problem is that the ambiguity-producing sentence *is* in the policy. Courts cannot engage in a fiction that conflicting language in the policy does not exist. Courts interpret insurance policies that *do exist,* not those that could have or should have existed. It is well understood that "[n]o contract of insurance should be rewritten by construction to bind an insurer to a risk which it did not contemplate and for which it was not paid." *Maas v. Ziegler,* 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992) (citing *Inter-Ins. Exch. v.*

*Westchester Fire Ins. Co.,* 25 Wis. 2d 100, 104, 130 N.W.2d 185 (1964)). The corollary of this rule is that ambiguity-producing language cannot be deleted to cure ambiguity. After all, an insured attempting to make a reasoned interpretation of his or her policy may not ignore language that is seemingly relevant to a provision whose meaning is being ascertained.

¶ 35. In the present case, the theory of interpretation advanced by the court of appeals and the Folkmans is that the location of the ambiguity-producing sentence in the paragraph on property damage liability means, by negative implication, that its absence in the bodily injury liability paragraph changes the limitations in that paragraph. While we reject this interpretation as being unreasonable for an ordinary insured, we cannot do so by simply erasing the actual language from the policy. Whatever ambiguity is created by the location of the "This is the most we will pay" sentence, it should be evaluated in the context of the whole policy.

V

¶ 36. Our rejection of Society's proposals to reconstruct the rules of insurance contract interpretation does not resolve the central question to this case: Is the operation of the bodily injury limits of liability in the Folkmans' policy ambiguous to a reasonable insured, even when those provisions are read in the context of the entire policy?

¶ 37. To answer this question we must look to the language of the policy. We start with the declarations page, which is "generally the portion of an insurance policy to which the insured looks first," *Schmitz,* 255 Wis. 2d 61, ¶ 62, and "is the most crucial section of the

policy for the typical insured." *Dowhower,* 236 Wis. 2d 113, ¶ 40 (Bradley, J., concurring).

¶ 38. The declarations page provides that Society's limits of liability for bodily injury are split limits, with $25,000 for each person and $50,000 for each occurrence. The juxtaposition of "each person" with "each occurrence" under the limits of liability heading implies that the $25,000 limit is for each injured person, not each insured, capped at $50,000 per occurrence. This has been the interpretation of this standard provision for many years. The page also makes clear that the named insured has paid the premium for bodily injury liability coverage for two vehicles, one of which Keith was driving at the time of the accident. We see no ambiguity on the declarations page that could imply more extensive coverage.

¶ 39. The next critical portion of the policy is the "Split Liability Limits" endorsement. The first paragraph of the endorsement discusses only bodily injury liability. It unambiguously specifies the maximum amount that will be paid out by and on behalf of all insureds is "our maximum limit of liability for all damages . . . from any one accident." Again, this language states:

> The limit of liability shown in the Schedule or in the Declarations for each person for Bodily Injury Liability *is our maximum limit of liability for all damages,* including damages for care, loss of services or death, *arising out of "bodily injury" sustained by any one person in any one auto accident.* Subject to this limit for each person, the limit of liability shown in the Schedule or in the Declarations for each accident for Bodily Injury Liability *is our maximum limit of liability for all damages for "bodily injury" resulting from any one auto accident.*

643

(Emphasis added.)

¶ 40. According to this language, the $25,000 limit is the maximum Society is liable for when one person is injured in an accident and the $50,000 limit is Society's maximum exposure, regardless of the number of people injured. in one automobile accident. As the court of appeals recognized, "It is plain from a reading of this entire section, in conjunction with the declaration page, that Society is not agreeing to pay for all damages for which 'any "insured" becomes legally responsible,' but only for those damages within the 'limit of liability.' " *Folkman,* 257 Wis. 2d 864, ¶ 10.

¶ 41. Nonetheless, the Folkmans argue, first, that Debra, Kenneth Sr., and Keith were each separately insured under the policy, which Society concedes. They note next that the "Limits of Liability" on the declarations page does not explain how these limits apply when more than one insured is liable for bodily injury resulting from a single accident. The Folkmans then assert that this same "ambiguity" exists with respect to the paragraph on bodily injury in the split liability limit endorsement. They contend that this paragraph does not inform an insured whether the limit of liability is the "maximum" it will pay for each insured or whether the limit of liability is the "maximum" Society will pay regardless of the number of people it insures.

¶ 42. We do not perceive any latent ambiguity in these portions of the policy. Instead, the Folkmans must *add* the words "for each insured" to the endorsement for it to acquire the meaning they offer. We may not judicially revise policy language in this manner. *See Frost,* 257 Wis. 2d 80, ¶ 17 ("If the language of an insurance policy is unambiguous, a court will not rewrite the policy by construction and will interpret the

policy according to its plain and ordinary meaning to avoid imposing contract obligations that the parties did not undertake.").

¶ 43. We must keep in mind that the Folkman policy is not novel. It is a standard policy comparable to hundreds of thousands of automobile insurance policies in Wisconsin. The basic provisions have been interpreted countless times. If we were the first court to see this policy, we might be more amenable to the statements by the court of appeals that "it is still not clear how the 'limit of liability' on the declaration page is to apply when more than one insured is liable for bodily injury caused by an accident," *Folkman v. Quamme*, 257 Wis. 2d 864, ¶ 10, and "it is reasonable to read the phrase 'maximum limit of liability' to mean the maximum limit of liability for all insureds, rather than for each insured," *id.*, ¶ 12. But we are not the first court to see this policy.

¶ 44. Given the policy's long history of interpretation, the insurer would have relied on the language at issue to limit its total liability for personal injury to $50,000 per occurrence or accident. If the insurer were not relying on this language to limit its liability, it could never be certain what its total liability would be. To illustrate this point using the Folkman theory, suppose that the Folkman car hit another vehicle and four people in the other car were badly injured. If Mrs. Folkman were driving alone, the insurer's total liability for one "insured" would be $50,000. If one of the Folkman children were driving, the liability would be $150,000 because of the vicarious liability of the two parental sponsors. If the other Folkman insured were in the car and found to be contributorily negligent, the liability would be $200,000. If the policy limits had been $200,000 per occurrence instead of $50,000, the poten-

tial liability would have climbed to $800,000. The Folkmans' interpretation is not a reasonable interpretation of the policy because it eviscerates any limit of liability.

¶ 45. A policy is normally interpreted objectively according to its terms. Thus, the subjective interpretation of terms by the insured is not relevant. However, the extent of the insurer's coverage is one of the few terms of the policy that requires discussion between the parties. When Debra Folkman purchased the policy, she must have instructed her agent how much insurance she wanted to purchase, what vehicles she wanted to cover, and which drivers she wanted to cover, because this information is reflected on the declarations page. We observe that all coverage to protect other parties was purchased at the minimum level as required by law. Moreover, the policy provides no underinsured motorist coverage to protect the drivers in the Folkman family from the negligence of others. There is no indication that either party actually considered deviating from standard contract terms.

¶ 46. There is no dispute that Society had a clear limit of liability on "page 3 of 11" of the original policy before the "split liability limits" endorsement. There is no dispute that the limit of liability is equally clear in medical payments coverage on page "4 of 11." It is clear again in the uninsured motorist coverage on page "5 of 11." Why would the insurer change its position in the endorsement so that the limit of liability, "regardless of the number of 'insureds,'" applied only to property damage?

¶ 47. Moving on, the Folkmans find ambiguity in the placement of the disputed sentence within the endorsement of "Split Liability Limits." The Folkmans

observe that the endorsement is split into two para-
graphs, one relating to bodily injury and the other to
property damage. *Id.* As alluded to above, the Folkmans
contend that the paragraph relating to bodily injury
liability does not clearly indicate that Society will pay
but one limit of liability regardless of the number of
insureds liable for any accident. Meanwhile, the para-
graph discussing property damage liability concludes
with a sentence that reads: "This is the most we will pay
regardless of the number of: (1) Insureds; (2) Claims
made; (3) Vehicles or premiums shown in the Declara-
tions; or (4) Vehicles involved in the auto accident." The
Folkmans contend the preceding sentence applies only
to property damage, not bodily injuries, because the
sentence is placed in the paragraph on property damage
liability and because the use of the pronoun "this"
suggests that the sentence only applies to its most
immediate antecedent, which is the property damage
limits.

¶ 48. To bolster their view, the Folkmans compare
the old Paragraph A of the "limit of liability" section
with the change made to the paragraph as a result of
the endorsement. The Folkmans acknowledge that old
Paragraph A of the "Limit of Liability" section clearly
stated that Society would pay but one limit of liability
even if more than one insured was responsible for the
accident. Unlike this original paragraph, the new para-
graph does not suggest the same relationship between
policy limits and the number of insureds. On this
reasoning, the Folkmans conclude that Society elimi-
nated the "regardless of the number insured" exception
to bodily injury liability and confined the passage to
property damage.

¶ 49. For its part, Society concedes that the place-
ment of the "[T]his is the most we will pay" sentence in

the paragraph discussing property damage liability was a typographical error. The sentence should be and, according to Society, usually is in a separate paragraph that follows the property damage paragraph. As such, it would complete the language of the endorsement and apply to the entirety of the endorsement. Written in this way, it would also mirror the language of the limits of liability paragraph it had replaced.

¶ 50. Whatever error there may be in the placement or grammatical structure of the "This is the most we will pay" sentence in Society's split liability limits endorsement, the policy remains unambiguous regarding Society's obligation to indemnify its insureds for no more than $50,000 for bodily injuries from any one accident. After examining the whole policy, we find it unreasonable for an insured to infer from this one errant sentence that the insured was greatly expanding the policy's coverage and confining its liability limit to property damage. The function of the endorsement is to limit Society's liability obligations to $50,000 per accident, regardless of the number of "insureds." A reasonable insured would not find the endorsement language, combined with other portions of the policy, to be ambiguous, nor would a reasonable insured expect to receive any greater amount in compensation.

¶ 51. The Society policy at issue in this case is not akin to the insurance policy in *Schmitz*.[15] In *Schmitz*,

---

[15] *Schmitz* involved a person who was rendered a quadriplegic while a passenger in the vehicle of a driver whose insurance policy had a liability limit of $100,000. *Badger Mut. Ins. Co. v. Schmitz*, 2002 WI 98, ¶¶ 8–9, 255 Wis. 2d 61, 647 N.W.2d 223. The insured made a claim under his own policy's UIM coverage, which had a limit set at $250,000. *Id.,* ¶ 9–10. The insurer applied the policy's UIM reducing clause to reduce its UIM payments by the $100,000 paid by the driver's insurer. *Id.,* ¶ 11.

ambiguity was based on a confluence of factors. First, a reasonable insured would likely believe that the purchase of, say, $200,000 in underinsured motorist coverage would lead to a $200,000 payment from the insurer depending on the insured's level of damages. In fact, however, because the policy contained a reducing clause, the insurer would *never* pay $200,000 to the insured, and if the other party paid $200,000, the insurer would pay nothing. We had stated in *Dowhower* that the effect of the reducing clause should be made clear. *Dowhower,* 236 Wis. 2d 113, ¶ 33.

¶ 52. Second, the effect of the reducing clause was made clear but only in the reducing clause itself. There was no explanation of it. The policy made no reference to underinsured motorist coverage on its declarations page or in its index, so that the insured would have had some difficulty finding the UIM coverage and real difficulty finding the reducing clause on the twentieth page of the policy, where it was buried among other provisions.

¶ 53. Third, if the insured found the UIM page, a typical limits of liability provision followed immediately after the schedule for underinsured motorist coverage. It stated, among other things, "This is the most we will pay, implying that it would pay the policy limits, although it never would.

¶ 54. Fourth, one of the endorsements to the policy was entitled "Availability of Underinsured Motorists Coverage-Wisconsin." It read, in part, "The cov-

We found that a reasonable insured would not expect that his recovery, under the UIM provisions of the policy, would be reduced by the payments received from the underinsured motorist. *Id.,* ¶ 7. Thus, in the context of the entire policy, the reducing clause was ambiguous and rendered the UIM coverage illusory. *Id.*

erage will pay the remainder of the bodily injury damages up to the limit of liability you select for underinsured motorists coverage." That sentence implied more than the policy delivered.

¶ 55. After examining these factors, we said that "the American Merchants policy is a maze that is organizationally complex and plainly contradictory. It sends several false signals to the insured. It is not user-friendly." *Schmitz,* 255 Wis. 2d 61, ¶ 72. We said the policy was confusing, ambiguous, and provided illusory coverage in the context of the entire policy. *Id.*

¶ 56. In the Folkmans' policy, there is an informative declarations page that lays out the limits of liability. Courts cannot ask for an informative declarations page and then fault the insurer for failing to address every nuance and speculative interpretation of coverage that an insured might raise. The Society policy is clearly organized with a good index that, in four different places, refers to limits of liability. The index page states: "Please Note: There may be State Amendatory Endorsements." These endorsements are then listed on the declarations page.

¶ 57. An insured would have to go to the nineteenth page in the policy, which contains the endorsement for "Split Liability Limits," to notice that the sentence "This is the most we will pay regardless of the number of 'Insureds,' " is contained in the paragraph on property damage. The insured would then have to draw the inference that the placement of this sentence had magically increased coverage for personal injury because the insurer had eliminated its limit of liability from the bodily injury portion of the policy.

¶ 58. Here, an unreasonable negative implication must compete against clear text. The alleged ambiguity is not founded on contradictory language. We conclude

that the limits of liability provision is unambiguous, particularly when it is examined in the context of the whole policy.

## VI

¶ 59. In addition to their arguments on ambiguity, the Folkmans present an assortment of statutory violations allegedly caused by the policy's limit of liability clause. The Folkmans argue that the clause, if it is interpreted to deny multiple liability limits to each Folkman facing liability for Keith's accident, is void, because it is illusory and because it contravenes three statutes: Wis. Stat. §§ 632.32(3)(b); 632.32(5)(f); and 631.43(1). The application of these statutes to undisputed facts is a question of law that we review de novo. For the reasons discussed below, we conclude that the policy's limits of liability clause is valid and must be enforced.

¶ 60. Before beginning our analysis of each statute, we observe that the Folkmans' arguments are rooted, to some degree, in an erroneous premise. The Folkmans contend that Society failed to extend coverage to all insureds who were liable for the accident, namely, Keith Folkman (as driver), as well as Debra Folkman and Kenneth Folkman, Sr. (as sponsors of Keith Folkman). This overarching premise is false. Society did extend coverage to all three insureds. The problem the insureds face is not that one or more of them were not covered under the policy. The problem is that the named insured did not purchase a greater amount of per occurrence liability.

651

## A. The Omnibus Statute, Wis. Stat. § 632.32(3)

¶ 61. Wisconsin Stat. § 632.32(3), known colloquially as the omnibus coverage statute, states the following:

> Required provisions. Except as provided in sub. (5), every policy subject to this section issued to an owner shall provide that:
>
> (a) Coverage provided to the named insured applies in the same manner and under the same provisions to any person using any motor vehicle described in the policy when the use is for purposes and in the manner described in the policy.
>
> (b) Coverage extends to any person legally responsible for the use of the motor vehicle.

These required provisions are intended "to make sure when a policy insures a vehicle listed in the policy, the policy follows the vehicle to provide coverage for individuals that use it with permission and are responsible for using it. Insurance companies are prohibited from insuring only certain drivers." Anderson, *supra,* § 2.2[A] (citation omitted).

¶ 62. The Folkmans draw upon the language in Wis. Stat. § 632.32(3)(b) to claim that Society violated the omnibus statute by relying on the limits of liability in the policy in this case. The violation occurred, according to the Folkmans, because each dollar Society pays on behalf of one insured (Keith Folkman) subtracts from coverage owed to another (Debra or Kenneth Sr.) and, therefore, coverage has not been extended as required by § 632.32(3)(b).

¶ 63. The Folkmans' argument regarding the applicability of the omnibus statute fails. In two cases,

*Miller v. Amundson,* 117 Wis. 2d 425, 345 N.W.2d 494 (Ct. App. 1984), and *Iaquinta v. Allstate Ins. Co.,* 180 Wis. 2d 661, 510 N.W.2d 715 (Ct. App. 1993), the court of appeals interpreted the omnibus statute to double liability coverage, notwithstanding the limits of liability in the policies, because the negligence of two insureds in each case was viewed as a separate occurrence. *Miller,* 117 Wis. 2d at 430; *Iaquinta,* 180 Wis. 2d at 669. Under the rule in *Miller* and *Iaquinta,* limitation on liability conflicts with § 632.32(3)(b) when both the named insured and an additional insured that is "legally responsible for the use of the motor vehicle" are each actively negligent.

¶ 64. However, in cases of vicarious liability, § 632.32(3)(b) does not extend policy-limits protection to both the tortfeasor and the person or persons vicariously liable for the tortfeasor's wrongdoing. *See Mills v. Wis. Mut. Ins. Co.,* 145 Wis. 2d 472, 427 N.W.2d 397 (Ct. App. 1988) *overruled on other grounds by West Bend Mut. Ins. Co. v. Playman,* 171 Wis. 2d 37, 489 N.W.2d 915 (1992);[16] *Landsinger v. Am. Family Mut. Ins. Co.,* 142 Wis. 2d 138, 417 N.W.2d 899 (Ct. App. 1987).[17] In *Landsinger,* the court of appeals held that a person to whom the negligence of another is imputed is not entitled to separate liability coverage under Wis. Stat.

---

[16] *Playman* overruled *Mills* only with respect to the issue of whether Wis. Stat. § 631.43 applies to insurance coverage that is not mandated by statute. *West Bend Mut. Ins. Co. v. Playman,* 171 Wis. 2d 37, 43 & n.2, 489 N.W.2d 915 (1992).

[17] *See also Iaquinta v. Allstate Ins. Co.,* 180 Wis. 2d 661, 666, 510 N.W.2d 715 (Ct. App. 1993) ("where the negligence of the additional insured is merely *imputed* to the named insured, or where the named insured is vicariously liable, the holding of *Miller* is inapplicable and the policy limits expressed in the policy are unaffected by the omnibus statute").

§ 632.32(3)(b). *Landsinger,* 142 Wis. 2d at 142–43. In *Mills* the court specifically held that additional or increased policy limits are not available to a sponsor of a minor driver, since the sponsor's liability is based solely on imputed negligence of the driver. *Mills,* 145 Wis. 2d at 479. In instances where someone is "legally responsible for the use of a motor vehicle" but where he or she has no liability independent of the negligence of another, a single liability is shared by the tortfeasor and the sponsor.[18] The distinction between *Miller* and *Landsinger-Mills* reflects this sharing of a single liability.

¶ 65. We conclude that there is no conflict between Society's limit of liability clause and § 632.32(3)(b), because only Keith Folkman was actively negligent. Debra and Kenneth Sr. are merely vicariously liable. Following *Mills* and *Landsinger,* the plaintiffs are entitled to receive collectively from Society only the $50,000 per-occurrence liability limit. As in *Landsinger,* Debra and Kenneth Sr. each "received the same dollar-for-dollar protection" as Keith did for his own negligence. *Landsinger,* 142 Wis. 2d at 142–43. Therefore, liability coverage was extended to all those legally responsible for the use of the vehicle and Society's obligations were satisfied to the extent of a $50,000 payment. *Id.* at 143.

---

[18] *See* Arnold P. Anderson, *Wisconsin Insurance Law* § 2.17[B] (4th ed. 1998) ("*Mills* is consistent with the theories of parental liability. Whether the claim against parents is based on the sponsorship statute, negligent entrustment or negligence in supervision, there is only one occurrence.").

B. Anti-Stacking and Wis. Stat. § 632.32(5)(f)

¶ 66. Wisconsin Stat. § 632.32 allows insurers to provide exclusions to their automobile policies so long as these exclusions are not expressly prohibited under § 632.32(6) or by other applicable law. *Clark v. Am. Family Mut. Ins. Co.,* 218 Wis. 2d 169, 175, 577 N.W.2d 790 (1998). Wisconsin Stat. § 632.32(5)(f) was created in 1995 to permit insurance companies to prohibit insureds from stacking[19] insurance coverage protection from multiple policies or multiple premiums. *Id.* at 177 n.3; Anderson, *supra,* § 2.15[B]. This provision reads:

> A policy may provide that regardless of the number of policies involved, vehicles involved, persons covered, claims made, vehicles or premiums shown on the policy or premiums paid the limits for any coverage under the policy may not be added to the limits for similar coverage applying to other motor vehicles to determine the limit of insurance coverage available for bodily injury or death suffered by a person in any one accident.

---

[19] The concept of stacking has been previously explained by this court:

"Stacking" is just another word to denote the availability of more than one policy in the reimbursement of the losses of the insured. The second insurer's liability does not arise until the policy limits of the first are exhausted; nor does the third's arise until the combined limits of the first and second carriers are exhausted.

*West Bend Mut. Ins. Co. v. Playman,* 171 Wis. 2d 37, 40 n.1, 489 N.W.2d 915 (1992) (quoting P. Pretzel, *Uninsured Motorists* § 25.5(B)(1972)); *see also Carrington v. St. Paul Fire & Marine Ins. Co.,* 169 Wis. 2d 211, 223, 485 N.W.2d 267 (1992) ("Stacking refers to a situation where an insured attempts to collect reimbursements for the same loss under multiple policies.").

Since 1995, cases involving this subsection have been confined to the stacking of uninsured motorist (UM) and underinsured motorist (UIM) coverage.[20]

¶ 67. The Folkmans contend that Wis. Stat. § 632.32(5)(f) authorizes *only* the inclusion of a limit of liability clause that limits coverage based on the number of vehicles covered under the policy. They insist that Society's limit of liability clause effectively limits liability based on the number of insureds and does not fit within this narrow category of limits of liability permitted in § 632.32(5)(f). Therefore, the Folkmans assert, the clause is inconsistent with the statute and is void.

¶ 68. To support this theory of strict statutory prohibition, the Folkmans cite to *Blazekovic v. City of Milwaukee*, 2000 WI 41, 234 Wis. 2d 587, 610 N.W.2d 467, in which this court interpreted a UM exception in an automobile insurance policy and found it to be invalid under Wis. Stat. § 632.32(5)(j).[21] The court based its reasoning primarily on (1) how the policy

---

[20] *See, e.g., Clark v. Am. Family Mut. Ins. Co.*, 218 Wis. 2d 169, 176 n.3, 577 N.W.2d 790 (1998); *Dorschner v. State Farm Mut. Auto. Ins. Co.*, 2001 WI App 117, ¶ 12, 244 Wis. 2d 261, 628 N.W.2d 414; *Hanson v. Prudential Prop. & Cas. Ins. Co.*, 224 Wis. 2d 356, 370, 591 N.W.2d 619 (Ct. App. 1999).

[21] Wisconsin Stat. § 632.32(5)(j) states:

A policy may provide that any coverage under the policy does not apply to a loss resulting from the use of a motor vehicle that meets all of the following conditions:

1. Is owned by the named insured, or is owned by the named insured's spouse or a relative of the named insured if the spouse or relative resides in the same household as the named insured.

2. Is not described in the policy under which the claim is made.

3. Is not covered under the terms of the policy as a newly acquired or replacement motor vehicle.

exception at issue failed to satisfy the statutory requirements of a permissible "drive other car" exclusion; and (2) the court's conclusion that only such exclusions were permitted by the statute. *Id.*, ¶¶ 21, 42.

¶ 69. We hold that Wis. Stat. § 632.32(5)(f) has no bearing on the circumstances of this case. Society is not barred from creating a traditional limit on liability for bodily injury simply because the limit is not expressly authorized by subsection (5)(f). The focus of § 632.32(5)(f) is directed at policy provisions affecting UIM or UM coverage, or other coverage that implicates coverage to more than one vehicle. To read its scope beyond this subject matter is unreasonable and was not seemingly intended by the legislature.[22] Furthermore, *Blazekovic* is not controlling, as its reasoning was limited to a set of facts in relation to § 632.32(5)(j). In fact, *Blazekovic* lends credence to a distinction between general limits of liability and UIM coverage limits in the context of § 632.32(5). The decision clearly stated that "liability coverage differs from uninsured motorist coverage, and the two are not to be equated. . . . There is no indicia that the legislature intended a convergence of liability and uninsured motorist coverage in light of the different goals underlying the two types of insurance." *Blazekovic,* 234 Wis. 2d 587, ¶¶ 38–39.

---

[22] The legislative policy behind Wis. Stat. § 632.32(5)(f) is contained in the Legislative Council Information Memorandum 96–25 to 1995 Wisconsin Act 21, which states: "Section 632.32(5)(f), Stats., as created by the Act, permits motor vehicle insurance policies to prohibit 'stacking' of *uninsured* or *underinsured* motorist coverage or any other coverage, such as medical payments coverage, provided under the policies." (Emphasis in original.)

## C. "Other Insurance" Provisions and Wis. Stat. § 631.43(1)

¶ 70. The Folkmans also argue that the limit of liability clause in Debra's policy is void because it violates Wis. Stat. § 631.43(1), which states:

> When 2 or more policies promise to indemnify an insured against the same loss, no "other insurance" provisions of the policy may reduce the aggregate protection of the insured below the lesser of the actual insured loss suffered by the insured or the total indemnification promised by the policies if there were no "other insurance" provisions.

¶ 71. This section expressly prohibits insurance policy provisions, such as anti-stacking clauses, that have the effect of reducing coverage below the total aggregate indemnification promised by multiple policies. *See Clark,* 218 Wis. 2d at 179. The statute applies only when there are "two or more insurance policies [that] promise to indemnify an insured against the same loss." *Martin v. Am. Family Mut. Ins. Co.,* 2002 WI 40, ¶ 12, 252 Wis. 2d 103, 643 N.W.2d 452. The "2 or more policies" requirement means that § 631.43(1) will apply only to inter-policy stacking or to intra-policy stacking when two or more premiums are paid within the same policy *to cover the same loss. See Carrington v. St. Paul Fire & Marine Ins. Co.,* 169 Wis. 2d 211, 224, 485 N.W.2d 267 (1992) ("Where an insured pays separate premiums, he or she receives separate and stackable . . . protections whether the coverage is provided in one or more than one policy.").[23]

---

[23] *See also Playman,* 171 Wis. 2d at 40 n.1, 43–44; *Agnew v. Am. Family Mut. Ins. Co.,* 150 Wis. 2d 341, 348–49, 441 N.W.2d

¶ 72. Clearly, there is no inter-policy stacking at issue in this case, since only one policy was issued to Debra promising to indemnify her, Keith, and Kenneth Sr. against bodily injury losses from an accident. *See Mills*, 145 Wis. 2d at 482.[24] Neither is there any intra-policy stacking, because the policy charged only a single premium for bodily injury liability arising from use of the car that Keith was driving during the accident. For the foregoing reasons, the limit of liability clause in the Folkmans' policy is not an "other insurance" clause subject to regulation by § 631.43 and Society's policy did not reduce liability coverage to below the total indemnification promised by the policy.[25]

222 (1989) (citing *Wood v. Am. Family Mut. Ins. Co.*, 148 Wis. 2d 639, 651, 436 N.W.2d 694 (1989)); *Burns v. Milwaukee Mut. Ins. Co.*, 121 Wis. 2d 574, 577–78, 360 N.W.2d 61 (Ct. App. 1984); Anderson, *supra*, § 2.15.

[24] The court of appeals in *Mills* mentioned this principle when it stated: "This is not a stacking case under sec. 631.43(1), Stats., because there are not involved two or more policies promising to indemnify an *insurer* against the same loss." *Mills v. Wis. Mut. Ins. Co.*, 145 Wis. 2d 472, 482, 427 N.W.2d 397 (Ct. App. 1988) (emphasis added). This sentence was appended by a footnote quoting Wis. Stat. § 631.43(1), including its introductory language stating: "When 2 or more policies promise to indemnify an *insured* against the same loss, no "other insurance" provisions of the policy may reduce the aggregate protection of the insured below . . . ." *Id.* at 482 n.4 (emphasis added). It is apparent that the court of appeals intended to use the term "insured" as opposed to "insurer" in its sentence. *Id.* at 487.

[25] Nevertheless, the Folkmans argue that Society violated the spirit of Wis. Stat. § 631.43(1) by reducing the aggregate coverage for three insureds (Debra, Kenneth Sr., and Keith) to

## D. Illusory Coverage

¶ 73. As a final alternative, the Folkmans argue that the limit of liability clause renders Society's coverage illusory, because it ensures that Society will never cover Debra and Kenneth Sr.'s legal responsibility as sponsors for the accident, despite an express promise to do so. This argument is contingent on the Folkmans establishing that Debra and Kenneth Sr. had a legitimate expectation of separate policy limits. For the reasons expressed earlier in this opinion, the Folkmans are unable to demonstrate that such an expectation exists in the mind of a reasonable insured.

¶ 74. It is true that Society separately insured Debra and Kenneth Sr., hence promising to provide

coverage for only one insured. They cite *Schult v. Rural Mutual Insurance Co.,* 195 Wis. 2d 231, 536 N.W.2d 135 (Ct. App. 1995), to support this contention.

*Schult* does not support the Folkmans' theory under the facts of this case. In *Schult,* the court of appeals found the limit of liability clause to be an "other insurance" clause because the insured paid more than one premium to insure against the same loss and because he was driving a nonowned vehicle. *Id.* at 240. Due to the wording of the insurance premiums for his three vehicles, the court of appeals concluded that the insured was entitled to more coverage from an accident while driving a nonowned vehicle than he would have been entitled to had he been driving his own car. *Id.* at 242. According to the court, "Had [the insured] been driving one of his three covered vehicles, [the injured person]'s recovery would have been limited to $100,000 *because each premium insured against liability arising from the operation of the vehicle specified in the policy.*" *Id.* (citing *Agnew,* 150 Wis. 2d at 349) (emphasis added). In the present case, the insured, Keith, was driving an owned vehicle and the liability policy did not charge multiple premiums regarding bodily injury liability for that particular car.

coverage if they became "legally responsible" for an accident. This observation, however, does not alter the fact that Debra and Kenneth Sr. *were* both extended coverage; they merely happened to share the same liability subject to one limit of liability. The coverage purchased by the Folkmans is not illusory because the policy accurately and fairly set out its liability coverage terms in an unambiguous fashion and coverage was extended to each insured.

## VII

¶ 75. For the reasons expressed in this opinion, we hold that the Society insurance policy's provision limiting liability for bodily injures is unambiguous, both standing alone and in the context of the entire policy. Under the policy, Society agreed only to indemnify its insureds for a maximum of $50,000 for bodily injury liability from any one accident. We also conclude that the policy's limit of liability clause did not violate Wis. Stat. §§ 632.32(3)(b), 632.32(5)(f), or 631.43(1) and was not illusory.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 76. N. Patrick Crooks, J., did not participate.