Dustin DOWHOWER, a minor, by his Guardian ad Litem Susan Rosenberg, Tamara Dowhower and Larry Dowhower, Plaintiffs-Respondents,

v.

Simon MARQUEZ and Viking Insurance Company of Wisconsin, Defendants,

WEST BEND MUTUAL INSURANCE Co., Defendant-Appellant,†

AETNA LIFE INSURANCE Co., Defendant.

Court of Appeals

*No. 01–1347. Submitted on briefs November 6, 2003.—Decided December 10, 2003.*

2004 WI App 3

(Also reported in 674 N.W.2d 906.)

† Petition to review denied 2-24-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey Leavell* and *Christine M. Genthner* of *Jeffrey Leavell, S.C.*, of Racine.

On behalf of the plaintiffs-respondents, the cause was submitted on the briefs of *Robert L. Jaskulski* and *Brian P. Mularski* of *Domnitz, Mawicke & Goisman, S.C.*, of Milwaukee.

A nonparty brief was filed by *Eric Englund*, president for the Wisconsin Insurance Alliance.

A nonparty brief was filed by *William C. Gleisner, III*, of Milwaukee and *Charles David Schmidt* of *Cannon & Dunphy, S.C.*, of Brookfield for The Wisconsin Academy of Trial Lawyers.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. In *Dowhower ex rel. Rosenberg v. Marquez*, 2003 WI App 23, 260 Wis. 2d 192, 659 N.W.2d 57 (*Dowhower II*), we applied the principles of insurance contract interpretation espoused in *Badger Mutual Insurance Co. v. Schmitz*, 2002 WI 98, 255 Wis. 2d 61, 647 N.W.2d 223, to the insurance policy West Bend Mutual Insurance Company issued to the Dowhowers. Applying the *Schmitz* methodology, we concluded that although the reducing clause in the underinsured motorist (UIM) provision of the policy, standing alone, was unambiguous, the clause's effect was ambiguous within the context of the whole policy and therefore the clause was unenforceable. But in making this determination, we also used the wording found in the *Schmitz* opinion and concluded that the clause's effect was not "crystal clear" within the context of the whole policy.

825

¶ 2. Recently, however, in *Folkman v. Quamme*, 2003 WI 116, ¶¶ 29–30, 264 Wis. 2d 617, 665 N.W.2d 857, the supreme court clarified *Schmitz* and the analytical framework that courts are to apply in cases alleging contextual ambiguity in insurance policies. In *Folkman*, the court held that the "crystal clear" language in *Schmitz* had produced the unintended effect of altering the analytical focus in cases involving alleged contextual ambiguity. *Folkman*, 264 Wis. 2d 617, ¶ 30. The court then vacated our decision and remanded the case to us for reconsideration in light of its teachings.

¶ 3. We are convinced that *Folkman* does not undermine but, rather, supports our holding in *Dowhower II*. In *Folkman*, the supreme court reaffirmed the principle of contextual ambiguity that guided our previous decision and instructed that a policy with a clear UIM provision can still be rendered ambiguous by the "organization, labeling, explanation, inconsistency, omission, and text of other provisions in the policy." *Folkman*, 264 Wis. 2d 617, ¶¶ 19, 24. As we explained in *Dowhower II*, West Bend's policy is an organizational maze making it nearly impossible for a reasonable insured to locate, let alone to understand the effect of, the reducing clause. As a consequence, the policy fails to inform a reasonable insured that he or she is purchasing a fixed level of UIM recovery that would be arrived at by combining payments made from all sources. Accordingly, we hold that the policy is contextually ambiguous and affirm the trial court judgment declaring the reducing clause unenforceable and requiring West Bend to pay the Dowhowers the full $50,000 limit of liability guaranteed in the policy.

¶ 4. The facts are undisputed and we take them primarily from *Dowhower ex rel. Rosenberg v. West Bend Mutual Insurance Co.*, 2000 WI 73, 236 Wis. 2d

113, 613 N.W.2d 557 (*Dowhower I*) and *Dowhower II.* While crossing the street in April 1997, Dustin Dowhower, a minor, was injured as a result of the negligence of a motorist. Viking Insurance Company of Wisconsin insured the vehicle that struck Dowhower. Viking's policy carried a limit of $25,000 per person. Viking paid its $25,000 policy limit to the Dowhowers. Pursuant to both WIS. STAT. § 632.32(5)(i) (2001–02),[1] which authorizes insurance companies to include reducing clauses in their policies, and the reducing clause in the Dowhowers' policy, West Bend paid the Dowhowers $25,000, an amount representing the $50,000 UIM bodily injury limit under the Dowhowers' UIM policy, minus the $25,000 paid by Viking.

¶ 5. The Dowhowers sought a judgment from the trial court declaring unenforceable the reducing clause provision in the UIM section of the policy and contending that WIS. STAT. § 632.32(5)(i) violated the United States and Wisconsin Constitutions. West Bend filed a motion to dismiss the action and counterclaimed for a declaration that it had paid all that it owed pursuant to § 632.32(5)(i) and the policy language. The trial court granted the Dowhowers' motion for declaratory judgment on the grounds that § 632.32(5)(i) violated the substantive due process rights of the Dowhowers. The court further declared that West Bend was obligated to provide $50,000 in UIM benefits to the Dowhowers. West Bend appealed and we certified to our supreme court the issue of whether § 632.32(5)(i) violates substantive due process under the state and federal constitutions.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 6. The supreme court accepted our certification and reversed the judgment of the trial court, holding that the statute did not deprive the Dowhowers of their constitutionally protected rights. *Dowhower I*, 236 Wis. 2d 113, ¶¶ 9, 36. The supreme court directed the trial court to determine on remand whether the language contained in the policy was ambiguous and, if so, whether a reasonable person in the position of the insured would have understood the policy to mean that the $50,000 limit in UIM coverage was to be a maximum recovery from all sources. *Id.*, ¶ 36. On remand, the trial court concluded that the policy was ambiguous and a reasonable person in the position of the Dowhowers would not have understood the policy to mean that the $50,000 limit in UIM coverage was to be a maximum recovery from all sources. The court then declared the UIM reducing clause in the policy unenforceable and required West Bend to pay the full $50,000 on the policy. West Bend appealed.

¶ 7. On appeal, West Bend contended both that the policy clearly informed the reasonable insured that his or her recovery would be reduced by any payments on behalf of the tortfeasor and that even if the policy did contain some inconsistencies, its reducing clause clarified them and rendered the policy unambiguous and enforceable. *Dowhower II*, 260 Wis. 2d 192, ¶ 7. Relying on our supreme court's decision in *Schmitz*, we concluded that the reducing clause was ambiguous. *Dowhower II*, 260 Wis. 2d 192, ¶ 1. We reasoned:

> While the reducing clause, standing alone, is unambiguous, the law prevents us from reading the clause in a vacuum as West Bend asks us to do. *Schmitz* dictates that we review what appears to be an unambiguous reducing clause within the context of the entire insurance policy to determine whether the coverage provided

is understandable and clear. *Schmitz* teaches us that in order for the policy to explain the effects of the reducing clause with crystal clarity, all of the provisions helping the insured navigate his or her way through the policy must be consistent with one another and with the reducing clause.

*Dowhower II*, 260 Wis. 2d 192, ¶ 22 (citation omitted). We then thoroughly reviewed the policy and determined that the policy's sections sent "contradictory messages that would befuddle a reasonable insured." *Id.*, ¶ 23. We explained:

> While an insured might carefully work his or her way through the policy as instructed in the Table of Contents, after doing so, he or she still would not understand the extent of his or her UIM coverage. Viewed in conjunction, the Declarations page, the Endorsement Schedule, the Table of Contents and the UIM provisions create confusion and would lead the reasonable insured to expect full coverage from West Bend in the amount of $50,000. The reducing clause, when viewed in the context of the whole policy, fails to clearly set forth that the insured is purchasing a fixed level of UIM recovery arrived at by combining payments from all sources. Thus, the reducing clause's effect is not crystal clear within the context of the whole policy.

*Id.* (citations omitted). West Bend subsequently petitioned the supreme court for review. As we indicated at the outset, the supreme court granted the petition, vacated our opinion and remanded the matter to us for further review in light of its decision in *Folkman*. *Dowhower ex rel. Rosenberg v. Marquez*, 2003 WI 127, 265 Wis. 2d 410, 411, 668 N.W.2d 735.

¶ 8. The resolution of this case turns upon the *Folkman* court's clarification of the principles of insurance policy interpretation courts are to apply in cases

alleging contextual ambiguity. We therefore begin our analysis with a discussion of that case.

¶ 9. In *Folkman*, Debra Folkman and one of her sons were injured in an automobile accident with another vehicle. *Folkman*, 264 Wis. 2d 617, ¶ 4. Society Insurance had issued an insurance policy to Debra as the named insured. *Id.*, ¶ 5. The policy also covered Debra's husband and their sons. *Id.* The declarations page of the Society policy recited UIM "split limits" coverage of "$25,000 for 'each person' and $50,000 for 'each occurrence.' " *Id.*, ¶ 6. Debra, her husband and son brought suit against Society pursuant to the UIM provisions of the policy. *Id.*, ¶¶ 8–9. In response, Society filed a motion seeking to deposit $50,000 with the circuit court and then to be dismissed from the action. *Id.*, ¶ 8. Society contended that its payment fully discharged its duties to the Folkmans. *Id.* The Folkmans opposed the motion, arguing that the "per person" and "per occurrence" limits of liability should apply separately to each of the three insureds. *Id.*, ¶ 9. The circuit court ruled in favor of Society, but we reversed, concluding that Society's limits of liability for bodily injury were ambiguous when read in conjunction with the policy's split liability limits endorsement. *Id.*, ¶¶ 10–11. The supreme court reversed our ruling, holding that the insurance policy unambiguously limited Society's liability to $50,000 for bodily injury arising from the accident. *Id.*, ¶ 2.

¶ 10. In its analysis of the issue, the court began by repeating the familiar general principles of insurance policy construction:

> Insurance contract interpretation presents a question of law that is reviewed de novo. The same rules of construction that govern general contracts are applied to the language in insurance policies. An insurance

policy is construed to give effect to the intent of the parties as expressed in the language of the policy.

*Id.*, ¶ 12 (citations omitted). Thus, the court advised that "the first issue in construing an insurance policy is to determine whether an ambiguity exists regarding the disputed coverage issue." *Id.*, ¶ 13. According to the court,

> [i]nsurance policy language is ambiguous "if it is susceptible to more than one reasonable interpretation." If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law. If there is an ambiguous clause in an insurance policy, we will construe that clause in favor of the insured.

*Id.* (citations omitted). The court then announced that it was going to use the case as a vehicle to discuss ambiguity and the effect it has on insurance policy construction. *Id.*, ¶ 15.

¶ 11. The court began its discussion of ambiguity with a "recitation of general principles":

> Occasionally a clear and unambiguous provision may be found ambiguous in the context of the entire policy. Insurers dislike this principle. Yet, the opposite principle—that courts must mechanically apply a clear provision *regardless* of the ambiguity created by the organization, labeling, explanation, inconsistency, omission, and text of the other provisions in the policy—is not acceptable.

> [C]ourts will not surrender the authority to construe insurance contracts in favor of the insured when a policy is so "ambiguous or obscure," or deceptive that it befuddles the understanding and expectations of a reasonable insured.

*Id.*, ¶¶ 15, 19, 20 (citations omitted). The court then

recognized the concept of contextual ambiguity as established precedent, "[a]s a general matter, it has long been a rule of contract construction in Wisconsin that 'the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole.' " *Id.*, ¶ 24 (citation omitted).

¶ 12. The court further explained that in assessing claims of contextual ambiguity,

> [s]ometimes it is necessary to look beyond a single clause or sentence to capture the essence of an insurance agreement. The language of a policy should not be made ambiguous by isolating a small part from the context of the whole.
>
> . . . .
>
> [A]ny contextual ambiguity in an insurance policy must be genuine and apparent on the face of the policy, if it is to upset the intentions of an insurer embodied in otherwise clear language. The test for determining whether contextual ambiguity exists is the same as the test for ambiguity in any disputed term of a policy. That is, are words or phrases of an insurance contract, when read in the context of the policy's other language, reasonably or fairly susceptible to more than one construction?
>
> The issue then is, what degree of contextual ambiguity is sufficient to engender an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language?

*Id.*, ¶¶ 21, 29, 30. In announcing this approach to contextual ambiguity, the court acknowledged the "unintended effect" of the language in *Schmitz* indicating that "reducing clauses must be crystal clear in the context of the whole policy" for insureds to understand what they are purchasing. *Folkman*, 264 Wis. 2d 617,

¶ 30. The court cautioned that *Schmitz* did not demand · perfection in policy draftsmanship and courts should not "[ferret] through a policy to dig up ambiguity." *Folkman*, 264 Wis. 2d 617, ¶¶ 31, 32. Instead, the court explained, "[t]o prevent contextual ambiguity, a policy should avoid inconsistent provisions, provisions that build up false expectations, and provisions that produce reasonable alternative meanings." *Id.*, ¶ 31.

¶ 13. Having set forth the analytical framework courts are to use when assessing contextual ambiguity, the court applied that framework to the policy Society issued to the Folkmans. The court first looked to the declarations page of the Society policy, which it described as "the portion of an insurance policy to which the insured looks first . . . and is the most crucial section of the policy for the typical insured." *Id.*, ¶ 37 (citation omitted). The declarations page recited UIM split limits of "$25,000 for each person and $50,000 for each occurrence." *Id.*, ¶ 38. The court saw "no ambiguity on the declarations page that could imply more extensive coverage." *Id.*

¶ 14. The supreme court next looked to the "Split Liability Limits" endorsement to the Society policy. *Id.*, ¶ 39. The court observed that this endorsement echoed the maximum limits of liability stated in the declarations page and that the endorsement linked this limit to "each person" and "any one person" injured in "any one auto accident." *Id.* at ¶¶ 39–40. Therefore, the court rejected the Folkmans' argument that the "per person/per occurrence" language of the policy should be read to mean "per insured." *Id.*, ¶ 40. Instead, the court held that the endorsement "unambiguously specifies the maximum amount that will be paid out by and on behalf of all insureds." *Id.*, ¶ 39.

¶ 15. Based on this same reasoning, the supreme court rejected the Folkmans' further argument that the limits of liability recited on the declarations page and in the split liability limit endorsement "does not explain how these limits apply when more than one insured is liable for bodily injury resulting from a single accident." *Id.*, ¶ 41. To adopt this argument, the court said it would have to add the phrase "for each insured" to the policy. *Id.*, ¶ 42. The court held that it could not revise policy language where the language was unambiguous. *Id.*

¶ 16. Finally, the supreme court addressed the organization and structure of the Society policy. The court observed that the declarations page in the Society policy was "informative" and "lays out the limits of liability." *Id.*, ¶ 56. In addition, the court said, "[c]ourts cannot ask for an informative declarations page and then fault the insurer for failing to address every nuance and speculative interpretation of coverage that an insured might raise." *Id.* The court also observed that the Society policy "is clearly organized with a good index that, in four different places, refers to limits of liability." *Id.* In addition, the court noted that the index page cautioned, "Please Note: There may be State Amendatory Endorsements," and that the endorsements were listed on the declarations page. *Id.*

¶ 17. Based on this analysis, the supreme court concluded that the Society policy was not akin to the policy in *Schmitz*, where the ambiguity was based on a "confluence of factors." *Folkman*, 264 Wis. 2d 617, ¶ 51. First, unlike *Schmitz*, where the court concluded that a reasonable insured would expect full recovery under the UIM provision in the policy at issue, the court found that the effect of the reducing clause in the Society policy was made clear. *Folkman*, 264 Wis. 2d 617, ¶ 51.

Second, unlike *Schmitz*, where the policy made no reference to UIM coverage on its declarations page or in its index so that the insured would have had some difficulty finding the UIM coverage and real difficulty locating the reducing clause, the court held the policy had an informative declarations page and was clearly organized. *Folkman*, 264 Wis. 2d 617, ¶¶ 52, 56. Third, unlike *Schmitz*'s UIM page, the court held that Society's UIM page did not contain language implying that the insurer would pay the policy limits, although it never would. *Folkman*, 264 Wis. 2d 617, ¶ 53. Finally, unlike *Schmitz*'s endorsement page, the court held Society's policy did not imply more than the policy delivered. *Folkman*, 264 Wis. 2d 617, ¶ 54.

¶ 18. Thus, according to the court, unlike the *Schmitz* policy, the Society policy did not represent "a maze that is organizationally complex and plainly contradictory" which sent several false signals to the insured. *Folkman*, 264 Wis. 2d 617, ¶ 55 (citing *Schmitz*, 255 Wis. 2d 61, ¶ 72). Instead, an unreasonable negative implication had to compete against clear text in a well-organized policy and this did not engender sufficient ambiguity to render the clause unenforceable. *See Folkman*, 264 Wis. 2d 617, ¶ 58.

██ ██

¶ 19. We recognize that in *Dowhower II* we wrote, "*Schmitz* teaches us that in order for the policy to explain the effects of the reducing clause with *crystal clarity*, all of the provisions helping the insured navigate his or her way through the policy must be consistent with one another and with the reducing clause " and for this reason the supreme court vacated our decision. *See Folkman*, 264 Wis. 2d 617, ¶ 30 n.14 (emphasis added). As we have already indicated, *Folkman* clarifies, but does not overrule, *Schmitz*'s applica-

tion of the principle of contextual ambiguity. *See Folkman*, 264 Wis. 2d 617, ¶¶ 30, 31. *Folkman* establishes that the standard for addressing alleged contextual ambiguity is whether the "organization, labeling, explanation, inconsistency, omission, and text of other provisions in the policy" create "an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language." *Id.*, ¶¶ 19, 30. *Folkman* further teaches that in order to resolve this issue, the court should trace the route the insured would have to take from the declarations page to the reducing clause. *See id.*, ¶¶ 37–50 (examining the entire policy from declarations page to the provision at issue). We used the phrase "crystal clarity" in *Dowhower II* as nothing more than shorthand for "unambiguous within the context of the whole policy," a principle *Folkman* reaffirmed. Despite this fact, we will not rubber-stamp our decision in *Dowhower II*. Rather, in fairness to West Bend, and because it supports the integrity of the judicial process, we feel obliged to examine the West Bend policy anew, with the teachings of both *Schmitz* and now *Folkman* in mind.

¶ 20. The declarations page in the West Bend policy lists the UIM coverage as "$50,000 each person $100,000 each accident" and does not provide any further explanation of the extent of the policy's UIM coverage. While we acknowledge that a lack of immediate explanation of a policy's reducing clause is not dispositive, *see Folkman*, 264 Wis. 2d 617, ¶ 21 ("[t]he language of a policy should not be made ambiguous by isolating a small part from the context of the whole"); *Sukala v. Heritage Mutual Insurance Co.*, 2000 WI App 266, ¶ 11, 240 Wis. 2d 65, 622 N.W.2d 457, *overruled on other grounds by Schmitz*, 255 Wis. 2d 61 ("[a] declarations page is intended to provide a summary of coverage

and cannot provide a complete picture of coverage under a policy"), we do observe that the declarations page in no way assists the insured in understanding that the limits of liability are subject to conditions and exceptions set forth later in the policy. Further, the declarations mislead the insured about where to find the UIM coverage in the policy. UIM coverage is listed under "Coverage C" "uninsured motorist" coverage. However, the policy's uninsured motorists coverage does not even reference UIM coverage.

¶ 21. The endorsement schedule follows the declarations page, which lists numbers for the "Split Underinsured Motorists Limits" and the "Underinsured Motorists Coverage-Wisconsin." The endorsement schedule does not explain: (1) what "endorsements" are; (2) what effect, if any, endorsements may have on coverage; or (3) where the insured can even find the endorsements in the policy. Further, the use of numbers by West Bend, without more, is simply useless information for the policyholder.

¶ 22. The third page, the table of contents, provides a list of the various types of coverage contained in West Bend's policy and directs the policyholder to the pages of the policy where the coverages and limits of liability can be found. However, the table of contents fails to even mention UIM coverage at all. Further, although the table of contents does instruct the policyholder to read the entire policy, it does not alert the insured to the existence, much less the location and effect, of the policy's endorsements.

¶ 23. The fifth page sets forth the policy's definitions. It does not define "declarations," "endorsement," "reducing clause" or "underinsured motorist."

¶ 24. Following the body of the policy and an endorsement, neither of which even mentions UIM

coverage, is a page purportedly summarizing the "major changes" in the policy. The summary, which is located on the twenty-second page of the policy and represents the first indication that there are changes to the policy, discusses uninsured motorists coverage, but does not reference UIM coverage at all. It instructs the insured to return to the declarations page for "complete information on the coverages [provided]." However, as noted previously, the declarations page lists underinsured motorists coverage under the section entitled "uninsured motorist" coverage.

¶ 25. Next, following an advertisement for automobile window replacement, the policy contains another page purporting to be a notice to policyholders of the major changes in the policy. This page notifies the insured that the underinsured motorists provision has been revised, but only as it relates to the "stacking" of limits. It does not refer to the reducing clause. Furthermore, this notice instructs the insured to return to the declarations page for more information on the coverages provided.

¶ 26. Finally, on the thirty-second and thirty-third pages of the policy, the UIM coverage is explained. The thirty-second page of the policy is entitled "Split Underinsured Motorists Limits" and directs the insured to replace the first provision under the heading "Limit of Liability" on the "Underinsured Motorists Coverage —Wisconsin" endorsement on the following page with the language on that page. After having replaced the first provision, the endorsement reads:

**LIMIT OF LIABILITY**

 **A.** The limit of liability shown in the Schedule or in the Declarations for each person for Underinsured Motorists Coverage is our maximum limit

of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Schedule or in the Declarations for each accident for Underinsured Motorists Coverage is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident. This is the most we will pay regardless of the number of:

1. "Insureds;"

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident.

**B.** The limit of liability shall be reduced by all sums:

1. Paid because of the "bodily injury" by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid under Part A; and

2. Paid or payable because of the "bodily injury" under any of the following or similar law:

 a. Workers' compensation law; or

 b. Disability benefits law.

¶ 27. The Dowhowers argue that the language in section A directly conflicts with the reducing clause. More specifically, the Dowhowers contend that the references in section A to the declaration's limit of liability being described as "our maximum limit of liability for all damages" and "the most we will pay"

imply that the stated full limit is attainable, when it is not because of the reducing clause. However, *Folkman* dictates that when considering an alleged contextual ambiguity, we must look beyond a single clause or sentence and look at the contract as a whole. *Folkman*, 264 Wis. 2d 617, ¶¶ 21, 24. When read together, sections A and B inform the insured that his or her UIM coverage would be limited by the reducing clause.

¶ 28. West Bend argues that its policy is "easy to read" and "user friendly" and that because the UIM coverage, standing alone, is unambiguous, a "reasonable insured reading [the policy] could come to only one conclusion: The limit of coverage available for the insured's recovery was to be reduced by the payments made on behalf of the tortfeasor." We cannot agree. We have painstakingly poured over this policy on numerous occasions and each time it has been an interpretational nightmare. Unlike the policy in *Folkman*, the West Bend policy is organizationally complex. It throws up several roadblocks and detours in front of an insured trying to navigate his or her way through the policy. The declarations page, for some reason, sends the insured to the uninsured motorist provision, which does not even mention UIM coverage at all; the table of contents does not list UIM among the types of coverage provided in the policy and does not even alert the insured to the existence of endorsements that are attached at the end of the policy. The endorsement schedule, while listing underinsured motorists coverage, does not inform the insured that the endorsements will change the policy nor does it provide the insured with any guidance on how to locate the endorsements; and finally, the summary and notice send the insured back to the declarations page for a more complete description of the coverages. In short, with this policy,

"[t]here is no there there." *See State v. Williams*, 2001 WI 21, ¶ 99, 241 Wis. 2d 631, 623 N.W.2d 106 (Bablitch, J., dissenting) (quoting Gertrude Stein in JOHN BARTLETT, BARTLETT'S FAMILIAR QUOTATIONS 627 (Justin Kaplan ed., 16th ed. 1992)).

¶ 29. Although a policy need not be "crystal clear" to meet minimum legal standards, a policy cannot be "so 'ambiguous or obscure,' or deceptive that it befuddles the understanding and expectations of a reasonable insured." *Folkman*, 264 Wis. 2d 617, ¶ 20. In *Schmitz*, the court began with the premise that a reasonable insured would not realize or expect that his or her recovery under the UIM provision of the policy would be reduced by payments he or she received from other sources. *Schmitz*, 255 Wis. 2d 61, ¶ 7. The court then held that while the reducing clause and UIM provision were not themselves ambiguous, the policy's deficient organization, labeling and explanation failed to guide the insured to the realization that there was a change in the policy reducing the insurer's maximum limit of liability by the amount of the payments made to the insured from other sources. *Id.*, ¶¶ 60–75. West Bend's policy suffers from the same deficiency. The policy's inadequate and misleading organization, labeling and explanations make it nearly impossible for a reasonable insured to locate, let alone to comprehend the extent of, his or her UIM coverage. We are convinced that even after carefully working his or her way through the policy, a reasonable insured might not arrive at the conclusion that he or she has purchased a fixed level of UIM recovery that would be determined by combining payments made from all sources. Accordingly, we hold that the UIM provisions are contextually ambiguous and must be construed against West Bend and in favor

of coverage. We therefore affirm the decision of the trial court declaring the reducing clause unenforceable and requiring West Bend to pay the Dowhowers the full $50,000 guaranteed in the policy.

*By the Court.*—Judgment affirmed.