COMMERCIAL UNION MIDWEST INSURANCE COMPANY,
Plaintiff-Respondent,

v.

Lynn K. VORBECK and Lynn K. Vorbeck, personal representative of the Estate of Alan G. Vorbeck, Defendant-Appellant,†

EMPHESYS WISCONSIN INSURANCE COMPANY,
Defendant.

Court of Appeals

*No. 03–100. Submitted on briefs November 6, 2003.— Decided December 10, 2003.*

2004 WI App 11

(Also reported in 674 N.W.2d 665.)

† Petition to review denied 2-24-04.

204

206

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert L. Jaskulski* and *Brian P. Mularski* of *Domnitz, Mawicke & Goisman, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Michael T. Steber* of *Zimmerman & Steber Legal Group* of Brookfield.

An amicus curiae brief of The Wisconsin Insurance Alliance was filed by Eric Englund, State Bar of Wisconsin president.

Before Anderson, P.J., Brown and Nettesheim, JJ.

¶ 1. NETTESHEIM, J. In *Badger Mutual Insurance Co. v. Schmitz*, 2002 WI 98, ¶ 75, 255 Wis. 2d 61, 647 N.W.2d 223, the supreme court considered whether an underinsurance reducing clause in a motor vehicle

insurance policy was ambiguous, thereby rendering the underinsured motorist (UIM) coverage illusory. As part of the analysis, the *Schmitz* court said, "[R]educing clauses must be crystal clear in the context of the whole policy. Otherwise, insureds are not likely to understand what they are purchasing." *Id.,* ¶ 46. Following *Schmitz,* the court of appeals issued a number of opinions applying the *Schmitz* methodology, including the "crystal clear" test. *See Hanson v. Prudential Prop. & Cas. Ins. Co.,* 2002 WI App 275, ¶ 18, 258 Wis. 2d 709, 653 N.W.2d 915; *Dowhower ex rel. Rosenberg v. Marquez,* 2003 WI App 23, ¶ 1, 260 Wis. 2d 192, 659 N.W.2d 57, *vacated,* 2003 WI 127, 265 Wis. 2d 410, 668 N.W.2d 735 (Wis. Sep. 12, 2003) (No. 01–1347); *Van Erden v. Sobczak,* 2003 WI App 57, ¶ 21 n.3, 260 Wis. 2d 881, 659 N.W.2d 896, *vacated,* 2003 WI 129, 265 Wis. 2d 414, 668 N.W.2d 735 (Wis. Sep. 12, 2003) (No. 02–1595); *Gohde v. MSI Ins. Co.,* 2003 WI App 69, ¶ 17, 261 Wis. 2d 710, 661 N.W.2d 470, *vacated,* 2003 WI 128, 265 Wis. 2d 412, 668 N.W.2d 556 (Wis. Sep. 12, 2003) (No. 01–2121).

¶ 2. Recently, the supreme court revisited this question in *Folkman v. Quamme,* 2003 WI 116, 264 Wis. 2d 617, 665 N.W.2d 857. The *Folkman* court stated that its "crystal clear" language in *Schmitz* had produced "an unintended effect." *Folkman,* 264 Wis. 2d 617, ¶ 30 ("A series of court of appeals decisions decided post-*Schmitz* reveals that our admonition of 'crystal clarity' has been used to alter the analytical focus."). Having clarified *Schmitz,* the *Folkman* court then conducted its analysis without using the "crystal clear" test.

¶ 3. With the benefit of *Folkman*, we now address the instant appeal.[1] Lynn K. Vorbeck, in her personal capacity and as personal representative of the estate of her husband, Alan G. Vorbeck, appeals from a declaratory judgment limiting the liability of Commercial Union Midwest Insurance Company (Commercial) to $250,000 after application of the UIM reducing clause recited in the Commercial policy. Based on *Folkman*, we affirm the judgment.[2]

---

[1] Following the release of *Folkman v. Quamme*, 2003 WI 116, 264 Wis. 2d 617, 665 N.W.2d 857, the parties supplied us with letter briefs addressing the decision.

[2] We placed this case on hold until the supreme court had acted on the pending petitions for review filed in *Dowhower ex rel. Rosenberg v. Marquez*, 2003 WI App 23, 260 Wis. 2d 192, 659 N.W.2d 57, *vacated,* 2003 WI 127, 265 Wis. 2d 410, 668 N.W.2d 735 (Wis. Sep. 12, 2003) (No. 01–1347); *Van Erden v. Sobczak*, 2003 WI App 57, 260 Wis. 2d 881, 659 N.W.2d 896, *vacated,* 2003 WI 129, 265 Wis. 2d 414, 668 N.W.2d 735 (Wis. Sep. 12, 2003) (No. 02–1595); and *Gohde v. MSI Ins. Co.*, 2003 WI App 69, 261 Wis. 2d 710, 661 N.W.2d 470, *vacated,* 2003 WI 128, 265 Wis. 2d 412, 668 N.W.2d 556 (Wis. Sep. 12, 2003) (No. 01–2121). In the interim, however, the supreme court issued its opinion in *Folkman*. Based upon that decision, the supreme court: (1) granted the petitions for review in *Dowhower, Van Erden,* and *Gohde*; (2) vacated the court of appeals opinions in those cases; and (3) remanded the cases to the court of appeals for further review in light of *Folkman*.

Like the instant case, *Dowhower* is assigned to District II of the court of appeals. We are issuing our opinion in *Dowhower* simultaneously with our opinion in this case. The *Gohde* and *Van Erden* cases are assigned to other districts of the court of appeals, and those courts have not as yet issued opinions in those cases. The issue in this case and *Dowhower* is also raised in other cases currently pending in the court of appeals.

## FACTS AND PROCEDURAL HISTORY

¶ 4. The facts of this case are undisputed. On June 11, 2001, a vehicle driven by Peter Scimeca collided with a vehicle driven by Alan G. Vorbeck. Alan was critically injured in the accident and died the same day. At the time of the accident, Scimeca was insured by Liberty Mutual Insurance Company (Liberty Mutual). The Liberty Mutual policy carried $250,000 per person limits of liability for bodily injuries. Lynn made a claim against Liberty Mutual for the policy limits. Liberty Mutual honored the claim and paid the policy limits of $250,000.

¶ 5. At the time of the accident, Alan was insured under an insurance policy issued by Commercial. In addition to other coverage, the Commercial policy provided UIM "split limits" coverage in the amount of "$500,000 each person . . . $500,000 each accident."[3] Lynn made a claim against Commercial for the full UIM policy limits of $500,000. Commercial rejected the claim, relying on the policy's reducing clause, which stated that the limit of liability shown in the declarations page for each person "shall be reduced by all sums: 1. Paid because of the '**bodily injury**' by or on behalf of persons or organizations who may be legally responsible."[4] Based on Liberty Mutual's prior payment

---

[3] "Split limits" confers separate coverage "per person" and "per occurrence." *See Folkman*, 264 Wis. 2d 617, ¶ 6. "Single limits" coverage does not make such a distinction.

[4] WISCONSIN STAT. § 632.32(5)(i) (2001–02) grants insurers the right to reduce their limits of liability by the sums paid by or on behalf of the tortfeasor. The parties do not dispute that the reducing clause in the Commercial policy conforms to the strictures of this statute. Rather, the dispute is whether the

210

of $250,000, Commercial paid Lynn $250,000, not the maximum UIM policy limits of $500,000 as demanded.

¶ 6. Following its payment, Commercial instituted the instant declaratory judgment action and moved for summary judgment, seeking judicial confirmation that its $250,000 payment fully satisfied and discharged its obligations to Lynn. After briefing and oral argument from the parties, the trial court ruled in favor of Commercial. Acknowledging that the reading of the policy was "cumbersome," the court nonetheless concluded that such difficulty did not render the policy ambiguous. Although the court made its ruling without the benefit of *Folkman*, we conclude that the court essentially applied a *Folkman* analysis. Lynn appeals.

## STANDARD OF REVIEW

¶ 7. The grant or denial of a declaratory judgment is addressed to the trial court's discretion. *Jones v. Secura Ins. Co.*, 2002 WI 11, ¶ 19, 249 Wis. 2d 623, 638 N.W.2d 575. However, when the exercise of such discretion turns upon a question of law, we review the question de novo, benefiting from the trial court's analysis. *Id.* Here, the issue turns upon the construction of an insurance contract, an exercise that presents a question of law. *Folkman*, 264 Wis. 2d 617, ¶ 12. Similarly, summary judgment presents a question of law that we review de novo. *Hofflander v. St. Catherine's Hosp., Inc.*, 2003 WI 77, ¶ 26, 262 Wis. 2d

---

location and language of the reducing clause renders the Commercial policy contextually ambiguous and therefore unenforceable.

All references to the Wisconsin Statutes are to the 2001–02 version.

211

539, 664 N.W.2d 545. Summary judgment is commonly used to resolve issues of insurance policy coverage. *See Kendziora v. Church Mut. Ins. Co.*, 2003 WI App 83, ¶ 6, 263 Wis. 2d 274, 661 N.W.2d 456.

## DISCUSSION

¶ 8. We begin by addressing the principles of insurance policy construction set out in *Folkman*. Next, we address the supreme court's application of those principles to the insurance policy at issue in *Folkman*. Finally, with the assistance of *Folkman*, we analyze the Commercial policy at issue in this case.

### 1. The Folkman Principles of Insurance Policy Construction

¶ 9. The *Folkman* court began its discussion with a recital of the well-established black-letter principles governing the interpretation and construction of an insurance policy.

> Insurance contract interpretation presents a question of law that is reviewed de novo. The same rules of construction that govern general contracts are applied to the language in insurance policies. An insurance policy is construed to give effect to the intent of the parties as expressed in the language of the policy.

> Therefore, the first issue in construing an insurance policy is to determine whether an ambiguity exists regarding the disputed coverage issue. Insurance policy language is ambiguous "if it is susceptible to more than one reasonable interpretation." If there is no ambiguity in the language of an insurance policy, it is enforced as written, without resort to rules of construction or applicable principles of case law. If there is an ambigu-

ous clause in an insurance policy, we will construe that clause in favor of the insured.

. . . .

Our goal in interpreting insurance contracts is to discern and give effect to the intent of the parties. Insurers have the advantage over insureds because they draft the contracts. Thus, courts construe ambiguities in coverage in favor of the insureds and narrowly construe exclusions against insurers.

As a general rule, the language in an insurance contract "is given its common, ordinary meaning," that is, " 'what the reasonable person in the position of the insured would have understood the words to mean.' "

. . . .

Courts will interpret the words of an insurance contract against the insured when the interpretation conforms to what a reasonable person in the position of the insured would have understood the words to mean.

*Folkman*, 264 Wis. 2d 617, ¶¶ 12–13, 16–17, 20 (citations omitted).

¶ 10. Beyond these time-honored tenets of insurance policy construction, the *Folkman* court recited some principles new to Wisconsin law:

Some ambiguity is unavoidable because words are unable to anticipate every eventuality . . . .

Occasionally a clear and unambiguous provision may be found ambiguous in the context of the entire policy. Insurers dislike this principle. Yet, the opposite principle—that courts must mechanically apply a clear provision *regardless* of the ambiguity created by the

213

organization, labeling, explanation, inconsistency, omission, and text of the other provisions in the policy—is not acceptable.

[C]ourts will not surrender the authority to construe insurance contracts in favor of the insured when a policy is so "ambiguous or obscure," or deceptive that it befuddles the understanding and expectations of a reasonable insured.

*Id.*, ¶¶ 18–20 (citations omitted).

■

¶ 11. In addition, the *Folkman* court confirmed that Wisconsin case law has recognized the concept of "contextual ambiguity." "As a general matter, it has long been a rule of contract construction in Wisconsin that 'the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole.'" *Id.*, ¶ 24 (citation omitted). Thus, a clear phrase within a policy can be rendered ambiguous by contradictory language elsewhere in the policy. *Id.*, ¶ 28. As a result, "where a provision is subject to more than one interpretation, illogically located and labeled within the policy, and inconsistent with other provisions, it will be found to be ambiguous." *Id.* (citation omitted).

¶ 12. In assessing a claim of contextual ambiguity, the *Folkman* court noted:

Sometimes it is necessary to look beyond a single clause or sentence to capture the essence of an insurance agreement. The language of a policy should not be made ambiguous by isolating a small part from the context of the whole . . . .

. . . .

[A]ny contextual ambiguity in an insurance policy must be genuine and apparent on the face of the policy, if it is to upset the intentions of an insurer embodied in otherwise clear language. The test for determining whether contextual ambiguity exists is the same as the test for ambiguity in any disputed term of a policy. That is, are words or phrases of an insurance contract, when read in the context of the policy's other language, reasonably or fairly susceptible to more than one construction? . . .

. . . .

To prevent contextual ambiguity, a policy should avoid inconsistent provisions, provisions that build up false expectations, and provisions that produce reasonable alternative meanings.

*Id.*, ¶¶ 21, 29, 31 (footnote and citation omitted).

¶ 13. The *Folkman* court phrased the ultimate question of contextual ambiguity as follows: "[W]hat degree of contextual ambiguity is sufficient to engender an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language?" *Id.*, ¶ 30. *Folkman* thus holds that contextual ambiguity, in and of itself, does not render the provision at issue unenforceable. Rather, the inquiry is whether the contextual ambiguity "engender[s] an objectively reasonable alternative meaning." *Id.* As noted earlier, "where a provision is subject to more than one interpretation, illogically located and labeled within the policy, and inconsistent with other provisions, it will be found to be ambiguous." *Id.*, ¶ 28 (citation omitted). In such a situation the provision will not be enforced because it "build[s] up false expectations" and "produce[s] reasonable alternative meanings." *Id.*, ¶ 31.

¶ 14. Notably absent from the *Folkman* analysis is any application of the "crystal clear" standard stated in *Schmitz*.

## 2. Application to the Folkman policy

¶ 15. Having set out the principles of insurance policy construction in a case alleging contextual ambiguity, the *Folkman* court applied those principles to the insurance policy at issue.

¶ 16. Society Insurance had issued an insurance policy to Debra Folkman as the named insured. The policy also covered Debra's husband and their two sons. The declarations page of the Society policy recited UIM "split limits" coverage of "$25,000 for each person and $50,000 for each occurrence." *Folkman*, 264 Wis. 2d 617, ¶ 38.

¶ 17. Debra and one of her sons were injured as passengers in an automobile accident with another vehicle. Debra's other son was driving. Debra, her husband, and the passenger son sued Society under the UIM provisions of the policy.[5] In response, Society paid the maximum "per occurrence" amount of $50,000 to the circuit court and then sought dismissal of the complaint, contending that its payment fully discharged its duties. The Folkmans opposed the motion, arguing that the "per person" and "per occurrence" limits of liability should apply separately to each of the three insureds.[6] *Id.*, ¶ 9. The trial court ruled in favor

[5] The Folkmans also sued the other driver and his insurer.

[6] The Folkmans' theory of multiple liability was based on the following reasoning:

> a. the driver son, as the operator of the vehicle, was liable to Debra and her other son, as passengers of the vehicle, producing a claim of $50,000 ($25,000 for each insured);

of Society, but the court of appeals reversed, concluding that Society's limits of liability for bodily injury were ambiguous when read in conjunction with the policy's split liability limits endorsement. *Id.*, ¶ 11.

¶ 18. Upon further review, the supreme court reversed the court of appeals ruling. The supreme court first looked to the declarations page of the Society policy, which it described as "the portion of an insurance policy to which the insured looks first . . . and is the most crucial section of the policy for the typical insured." *Id.*, ¶ 37 (citation omitted). The declarations page recited UIM split limits of "$25,000 for each person and $50,000 for each occurrence." *Id.*, ¶ 38. The court saw "no ambiguity on the declarations page that could imply more extensive coverage." *Id.*

¶ 19. The supreme court next looked to the "Split Liability Limits" endorsement to the Society policy. The court observed that this endorsement echoed the maximum limits of liability stated in the declarations page and that the endorsement linked this limit to "each person" and "any one person" injured in "any one auto accident." *Id.*, ¶ 39. Therefore, the court rejected the Folkmans' argument that the "per person/per occurrence" language of the policy should be read to mean "per insured." *Id.*, ¶ 38. Instead, the court held that the endorsement "unambiguously specifies the maximum amount that will be paid out by and on behalf of all insureds." *Id.*, ¶ 39.

---

b. Debra was liable to the passenger son as the co-sponsor of the driver son's license, producing a claim of $25,000;

c. the father was liable to both Debra and the passenger son as the co-sponsor of the driver son's license, producing a claim of $50,000 ($25,000 for each insured).

*See Folkman*, 264 Wis. 2d 617, ¶ 9.

¶ 20. Based on this same reasoning, the supreme court rejected the Folkmans' further argument that the limits of liability recited on the declarations page and in the split liability limits endorsement "does not explain how these limits apply when more than one insured is liable for bodily injury resulting from a single accident." *Id.*, ¶ 41. To adopt this argument, the court said it would have to add the phrase "for each insured" to the policy. The court held that it could not engage in such a rewrite of the policy where the language was unambiguous. *Id.*, ¶ 42.

¶ 21. Finally, the supreme court addressed the organization and structure of the Society policy. The court observed that the declarations page in the Society policy was "informative" and "lays out the limits of liability." *Id.*, ¶ 56. In addition, the court said, "Courts cannot ask for an informative declarations page and then fault the insurer for failing to address every nuance and speculative interpretation of coverage that an insured might raise." *Id.* The court also observed that the Society policy "is clearly organized with a good index that, in four different places, refers to limits of liability." *Id.* In addition, the court noted that the index page cautioned, "Please Note: There may be State Amendatory Endorsements" and that the endorsements were listed on the declarations page. *Id.*

¶ 22. Based on this analysis, the supreme court concluded that the Society policy was not akin to the policy in *Schmitz. Folkman*, 264 Wis. 2d 617, ¶ 51. Unlike *Schmitz*, the court held that the effect of the reducing clause in the Society policy was made clear. *Folkman*, 264 Wis. 2d 617, ¶ 51. Unlike *Schmitz*, the court held that the Society policy did not make it difficult for the insured to locate the UIM coverage and the reducing clause. *Folkman*, 264 Wis. 2d 617, ¶¶ 52,

56. Unlike *Schmitz*, the court held that the Society policy did not create illusory coverage by implying that it would pay the policy limits, although it never would. *Folkman*, 264 Wis. 2d 617, ¶ 53. Finally, unlike *Schmitz*, the court held that the Society policy did not imply more than the policy delivered. *Folkman*, 264 Wis. 2d 617, ¶ 54. As a result, the court held that the Society policy did not represent "a maze that is organizationally complex and plainly contradictory." *Id.*, ¶ 55.

### 3. The Commercial Policy

■

¶ 23. We now turn to this case. Before setting out the relevant portions of the Commercial policy, we address an important preliminary matter. At various points, the Commercial policy cautions the insured to read the provisions carefully. While all insureds should read their policies, we know of no case that has resolved a contextual ambiguity issue on this basis.[7] Rather, the law resolves this question by asking "what the reasonable person in the position of the insured would have understood the words to mean." *Id.*, ¶ 17 (citation omitted). Similarly, no case has held that directives to read a policy or portions thereof defeat a claim of contextual ambiguity. If a policy is contextually ambiguous thereby producing a reasonable alternative meaning, no amount of directives to read the policy will alleviate that situation.

---

[7] In fact, the record in this case does not reveal whether the Vorbecks had read the Commercial policy.

¶ 24. This does not mean, however, that directives to read the policy or a particular provision are not relevant to the question of contextual ambiguity. To the contrary, if such directives serve as markers or directional signs that assist the reasonable insured in navigating through the policy, they become very relevant to a contextual ambiguity analysis.

¶ 25. With this consideration in mind and with the benefit of *Folkman*, we now examine the relevant portions of the Commercial policy.

### a. Organization and Structure

¶ 26. We first address the organization and structure of the Commercial policy, moving through the relevant portions of the policy in sequence. By our count, the policy is thirty-seven pages long, including a seven-page "Personal Auto Composite Endorsement-Wisconsin" addendum (Wisconsin Endorsement). The declarations page recites UIM split limits coverage of "$500,000 Each Person" and "$500,000 Each Accident." Immediately following this UIM recital, the policy advises the insured: "Please refer to the following sections for detailed information on vehicles, operators, and deductibles."

¶ 27. The first of the "following sections" is entitled "ATTACHMENTS." Before listing the attachments, the policy advises: "The following Forms, Endorsements, and Exceptions to Conditions are part of this policy at the time of issuance." This statement is followed by the following highlighted caution: "**Please read them carefully**." The second listed attachment is

the Wisconsin Endorsement, titled "Wisconsin Personal Auto Composite Endorsement" and is identified by a form number.

¶ 28. As noted, the Wisconsin Endorsement is a seven-page addendum to the policy. It is prefaced with the following highlighted language: **"THE ENDORSEMENTS CONTAINED IN THIS COMPOSITE CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.**" The reducing clause itself is located at page five of this endorsement.

¶ 29. We hold that these provisions pass muster under the *Folkman* analysis and do not produce contextual ambiguity. The policy takes the insured through the policy in an orderly and logical sequence. The policy first recites the split limits of UIM coverage on the declarations page and immediately thereafter cautions that the following attachments contain "detailed information on vehicles, operators and deductibles." Next, before listing the attachments, the policy advises, "The following Forms, Endorsements, and Exceptions to conditions are part of this policy . . . ." The Wisconsin Endorsement is then listed among the attachments. Finally, the Wisconsin Endorsement is prefaced with the highlighted caution, **"THE ENDORSEMENTS CONTAINED IN THIS COMPOSITE CHANGE THE POLICY."**

¶ 30. We find nothing in the location, labeling or language of these provisions that produces any contextual ambiguity. None of the provisions are inconsistent. Nor do they mislead the insured or build up false expectations producing an objectively reasonable alternative meaning of the policy. *See Folkman*, 264 Wis. 2d 617, ¶ 31. Neither does the policy set up roadblocks or diversions that would befuddle a reasonable insured

while navigating through the policy. Instead, the policy presents an orderly framework, allowing the insured to transition from section to section without undue confusion or frustration. In short, the Commercial policy does not represent the organizational maze condemned in *Schmitz*.

¶ 31. The only arguable failing in the Commercial policy is that the "Quick Reference" index does not expressly refer to the Wisconsin Endorsement, which recites the reducing clause.[8] However, as noted, the Wisconsin Endorsement *is expressly referenced* in the attachments that immediately follow the declarations page at the beginning of the policy. As also noted, the attachments are preceded by two important admonitions. First, the insured is instructed that the attachments contain detailed information regarding the policy. Second, the insured is warned that the attached "Forms, Endorsements, and Exceptions" are part of the policy. Moreover, the attachment refers to the Wisconsin Endorsement by its title and form number, both of which correspond to the actual endorsement. Armed with these warnings and that information, we conclude that a reasonable insured would seek out the Wisconsin Endorsement, even though it is not expressly referenced in the index.

¶ 32. Moreover, we have not located any case which *requires* that the policy index must expressly reference a reducing clause as a condition to enforcing the clause. Instead, this is but a factor, among others, which bears upon the enforceability of the reducing

---

[8] We assume the "Quick Reference" index does not reference the Wisconsin Endorsement because the policy, including the index, is a generic policy intended for use in all jurisdictions. As such, the index does not reflect any endorsements unique to a particular jurisdiction.

clause. *See Schmitz*, 255 Wis. 2d 61, ¶ 65. From our reading of *Folkman*, it does not appear that the reducing clause in the Society policy was referenced in the index, and the supreme court's holding does not rest on any such finding.[9] *Folkman*, 264 Wis. 2d 617, ¶ 56.

¶ 33. In summary, we conclude that the organization and structure of the Commercial policy does not produce any contextual ambiguity.[10] Therefore, the reducing clause recited in the Wisconsin Endorsement is in play in this case.

¶ 34. Before leaving this issue, we make an observation. We do not pretend that the reading of most insurance policies, including the Commercial policy, is an easy task. As the trial court aptly observed, the process is "cumbersome." But this difficulty does not per se render a policy contextually ambiguous. Rather, the question is whether the provisions under inquiry lead to a reasonable alternative meaning because of the language, location, labeling, or inconsistency with other provisions. *See id.*, ¶ 30. As indicated, we conclude that the organization and structure of the Commercial policy does not produce such a reasonable alternative meaning.

---

[9] Instead, the supreme court observed that the index referred four times to the "limits of liability." *Folkman*, 264 Wis. 2d 617, ¶ 56. We make a similar observation about the Commercial policy which, by our count, references the limits of liability five times.

[10] Even if we were to assume that some degree of contextual ambiguity exists, it is not "sufficient to engender an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language[.]" *Folkman*, 264 Wis. 2d 617, ¶ 30.

### b. Language of the Policy

¶ 35. Lynn also argues that even when considering the Wisconsin Endorsement, the policy is contextually ambiguous. She contends that the reducing clause in the Wisconsin Endorsement contradicts other language in the endorsement stating that the limits of liability set out in the declarations page is the maximum that Commercial will pay. Given that alleged contradiction, Lynn argues that the limits set out in the declarations page, unreduced by the Liberty Mutual payment, should apply.

¶ 36. Lynn's argument is premised upon the interplay between certain provisions of the "Single Limit Of Liability" and "Split Underinsured Motorists Limits" set out in the Wisconsin Endorsement. The "single limit" provision states at paragraph A, "The limit of liability shown in the Declarations for this coverage is our maximum limit of liability for all damages resulting from any one accident." The reducing clause then follows at paragraph B.

¶ 37. The "split limits" provision of the Wisconsin Endorsement substitutes the following paragraph for paragraph A of the "single limits" provision:

> If separate limits of liability for each person and each accident are shown in the Declaration for this coverage, paragraph A. of the Single Limit of Liability provision in the Underinsured Motorists Coverage Wisconsin Endorsement is replaced by the following:
>
> **Split Limit Of Liability**
>
> The limit of liability shown in the Declarations for each person for Underinsured Motorists Coverage is our maximum limit of liability for all damages . . . arising out of "**bodily injury**" sustained by any one person in

any one accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Underinsured Motorists Coverage is our maximum limit of liability for all damages for **"bodily injury"** resulting from any one accident. This is the most we will pay regardless of the number of: 1. **"Insureds;"** 2. Claims made; 3. Vehicles or premiums shown in the Declarations; or 4. Vehicles involved in the accident.

Lynn argues that this substituted paragraph unequivocally obligates Commercial to pay the maximum limits of its liability. She contends that the reducing clause is unenforceable because it contradicts this obligation.

¶ 38. We reject Lynn's argument because it violates *Folkman* on a number of levels. First, when considering alleged contextual ambiguity, we must look to the contract as a whole. *Folkman*, 264 Wis. 2d 617, ¶ 24. Second, we sometimes must look beyond a single clause or sentence to capture the essence of an insurance agreement. *Id.*, ¶ 21. Third, the language of a policy should not be made ambiguous by isolating a small part from the text of the whole. *Id.* Finally, "[f]erreting through a policy to dig up ambiguity should not be judicially rewarded because this sort of ambiguity is insufficient." *Id.*, ¶ 32.

¶ 39. We do not agree with Lynn that Commercial's statement in the substituted paragraph represents an unequivocal commitment to pay the maximum limits of its liability *to the exclusion of other relevant provisions of the policy.* Instead, we view this paragraph as stating nothing more than the obvious under the well-established precepts of insurance contract law: Commercial will pay the maximum of its

limits of liability *in the appropriate case and under the appropriate circumstances subject to the terms of the insurance policy read as a whole.* Reducing clauses are common to insurance policies. The reducing clause in paragraph B unambiguously qualifies Commercial's obligation to pay the maximum limits of liability recited in the substituted paragraph A.

¶ 40. The substituted language in paragraph A simply accommodates the situation where, as here, the insurance policy recites separate "split limits" of liability for each person and each accident as opposed to a policy that recites a single limit of liability. Moreover, the substituted paragraph A has no impact on the reducing clause of paragraph B, which remains in effect in either a single limit or split limit setting. Here, the reducing clause in paragraph B immediately follows the substituted paragraph A, and Lynn makes no argument that the "limit of liability" addressed in the "split limit" setting is not the same "limit of liability" addressed in the reducing clause.

¶ 41. Reading the Wisconsin Endorsement as a whole and in conjunction with the other provisions of the policy, we conclude that the endorsement unambiguously conveys that Commercial is obligated to pay the maximum of the UIM limits subject to the provisions of the reducing clause. Therefore, the endorsement is not susceptible to more than one reasonable interpretation and the policy language is not contextually ambiguous.[11]

---

[11] Again, even if we were to assume that some degree of contextual ambiguity exists, it is not "sufficient to engender an objectively reasonable alternative meaning and, thereby, disrupt an insurer's otherwise clear policy language[.]" *Folkman,* 264 Wis. 2d 617, ¶ 30.

## CONCLUSION

¶ 42. We conclude that the Commercial policy is not contextually ambiguous either in its structure or in its language. We affirm the judgment declaring that Commercial has fulfilled and discharged its obligations under the policy.

*By the Court.*—Judgment affirmed.

¶ 43. BROWN, J. *(concurring)*.

Whereas, on or about the night prior to Christmas

there did occur at a certain improved piece of real property (hereinafter "the House")

a general lack of stirring by all creatures therein,

including, but not limited to a mouse.

a variety of foot apparel, e.g. stocking, socks, etc., had been affixed

by and around the chimney in said House

in the hope and/or belief that St. Nick a/k/a St. Nicholas a/k/a Santa Claus (hereinafter "Claus")

would arrive at some time thereafter.

The minor residents, i.e. the children, of the aforementioned House, were located

in their individual beds.

and were engaged in nocturnal hallucinations, i.e. dreams, wherein visions of confectionary treats,

including, but not limited to, candies, nuts and/or sugar plums,

227

did dance, cavort and otherwise appear in said dreams.

¶ 44. So begins a bar journal article written by George H. Hathaway, who in 1998 was the chair of the Plain English Committee of the State Bar of Michigan. Hathaway, *The Seventh Annual (1998) Clarity Awards,* 77 Mich. B.J. 298 (1998).[1] Hathaway was writing about the "Search for Clarity" Awards, given out by the State Bar of Michigan, to promote the use of clear writing by legal professionals. Several clarity awards were given out that year, but none regarding insurance contracts. Hathaway explained in pertinent part, why:

> We are not giving an award to any specific insurance contract because most insurance contracts in Michigan are now written in clear, user-friendly plain English without legalese. This is because the insurance industry has voluntarily written its policies in plain English. Furthermore, plain English in insurance policies in Michigan is required by a statute . . . . New or revised insurance policies in Michigan must be approved by . . . the Michigan Insurance Bureau . . . .

*Id.* at 300–01.

¶ 45. Like the Plain English Committee of the State Bar of Michigan, this court has also seen change in the way insurance policies are written. Compared to years past, the policies are now written in simple words, short sentences and the active voice rather than in long pages of text without headings, complex sentences, passive construction, unnecessary legalese and multi-syllabic words. I assume that this was a voluntary

---

[1] Hathaway took this from The Night Before Christmas, Legally Speaking, by the Grinch, circulated on the Internet.

undertaking by the insurance industry, and I applaud the industry's readiness to draft its policies in understandable terms.

¶ 46. But more needs to be done. WISCONSIN STAT. § 631.22(2) requires all consumer policies to be "coherent, written in commonly understood language, legible, appropriately divided and captioned by its various sections and presented in meaningful sequence." While the statute goes on to say that violation of the statute does not void or render voidable any portion of an insurance policy and is not a defense to an action under the insurance policy, *see* WIS. STAT. § 631.22(6), it is nonetheless a public policy statement by our legislature reflecting the will of its citizenry. It is in that spirit that I write this concurring opinion.

¶ 47. It is my view that although policy language is now written in a simple, concise, short and uncomplicated way, too much industry jargon is used without much, if any, attempt to define the jargon for the consumer. Moreover, the policies quite often could be presented in much more meaningful sequences.

¶ 48. Let's take the two policies at issue in cases before this court, the decisions of which were issued this same day—*Dowhower*[2] and *Vorbeck*. Both policies use the word "endorsements" in the page after the declarations page. The *Dowhower* policy calls the page an "endorsement schedule" without any attempt to explain what an endorsement is. It simply lists a bunch of numbers which refer to the various endorsements. The *Vorbeck* policy also has a second page that includes a section called "attachments" and tells the policyholder that there are endorsements which are part of the

---

[2] *Dowhower ex rel. Rosenberg v. Marquez*, 2004 WI App 3, 268 Wis. 2d 823, 674 N.W.2d 906 (2003).

policy. Again, no attempt is made to explain what an endorsement is. *It is not until the policyholder actually turns to the endorsement itself that it tells how the endorsement "changes" the policy terms.* While many lawyers doing personal injury work—either for plaintiffs or for the defense—know from the beginning that an endorsement is a provision added to an insurance contract altering its scope or application, I doubt that one layperson in a hundred would come up with that definition. In common, everyday language, "to endorse" would mean to endorse a check or endorse a candidate. I hate to sound like Andy Rooney, but why can't insurance policies simply call changes in policies for what they are—changes? If the object is to alert the policyholder to changes in the terms and conditions of the policy, why not say so?

¶ 49. And what is the definition of "split liability limits?" The author of the lead opinion in this case had to literally hunt the electronic libraries to find a definition for this term. Think of how difficult it must be for the nonlawyer policyholder to understand what the term means. Instead of a heading entitled "split liability limits" which, I submit, leaves the policyholder clueless, why not say "maximum limit per person" and "total limit regardless of the number of insureds?"

¶ 50. I realize that insurers have used insurance jargon in policies for just about forever. But the passage of time has not made it any easier for the policyholding public to understand its terminology. Sometimes change is good. Maybe it's time for a change.

¶ 51. Ridding policies of jargon is only one part of the equation, however. Another part would be arranging policies by easy-to-use reference guides or indexes. While I understand the admonition in *Folkman v. Quamme,* 2003 WI 116, 264 Wis. 2d 617, 665 N.W.2d

857, that courts are not to hunt for ambiguity, neither should policyholders be forced to hunt for information about what is covered and what is not. Reading insurance policies should be not be a game of *Clue*. The panel in *Dowhower* had to scour the policy before it was able to turn up the information about the reducing clause. The panel in this case had a somewhat easier time of it because there was an index and because the policy as a whole read in a more sequential pattern. Instead of reworking the whole policy into one tight, unambiguous document, insurers tend to simply add more pages to a previously written policy whenever there is a change in the law or a change in how the insurers view risk. This practice is economically inefficient because it spawns lawsuits that could easily be avoided.

¶ 52. A third part of the equation, at least as far as underinsurance is concerned, would be to explain, up front, what underinsurance means. An insurer could easily explain in the body of the policy that if the policyholder is injured by another who has insurance, but that person's insurance is inadequate, the insurer will pay the difference up to an amount listed in the insured's policy that is not paid by other sources. The way most policies read now, the first paragraph of the "Limits of Liability" section of the underinsurance portion continue to define "The Limit of Liability" as: "the most that will be paid by the insurer that issues the policy." This is the same language that was in the policies before reducing clauses were legalized in Wisconsin through passage of Wis. Stat. § 632.32(5)(i). The unaware might think that the amount of underinsurance he or she is buying is the amount stated in the policy "in addition" to other sources of payment. Even in the endorsement section, this language is repeated. The policyholder has to read the next paragraph of the

endorsement to understand that the limit is "reduced" by payments from other sources. Why not simply write a policy that says, in no uncertain terms from the start that the maximum limit is that which is recoverable from all sources?

¶ 53. I am not naïve. I know that even if the changes I propose are acted upon, plaintiff's lawyers will still bring suits claiming that a policy is ambiguous. That is as certain as death and taxes because policy writers cannot foresee every circumstance which may arise and because the policy, as applied, may be claimed to be ambiguous in those circumstances. But I will bet that the number of lawsuits based on ambiguity would dwindle. And that would mean less litigation. And less litigation could only present a win-win situation for the insurance industry. The cost of producing a clearer policy is low and the economic benefit is high.

¶ 54. I am aware that many insurers use standard policy forms prepared by the Insurance Services Office, Inc. (ISO), a national insurance industry organization, while others use policy forms that they have prepared themselves but are based on ISO forms. My understanding is that the policy drafters at ISO are made up of employees in the industry. I suggest that the drafting committee be composed of English professors as well.

¶ 55. I am also not naïve enough to think that if the words on the page are simple, the underlying concepts will be simple. I know that, oftentimes, the simple word will not suffice. Some portions of an insurance policy are necessarily complex because they provide for possible problems during the contracting period and specify the rights and remedies of the parties. And I am not saying that these changes will guarantee an improvement in the percentage of policy-holders who actually read their policy. Still, if we are to

continue to hold that there is a "duty to read" a policy—as I think we should—that duty implies that the policy is readily readable. The easier we make the reading exercise and the more intelligible the reading becomes, the more the insurance contract is a product of a knowledgeable decision by the insured.

¶ 56. Finally, I observe that I am not the first appellate judge in Wisconsin to publicly share this view. Thirty-three years ago, in *Heater v. Fireman's Fund Ins. Co.*, 30 Wis. 2d 561, 565, 141 N.W.2d 178 (1966), then Justice Bruce Beilfuss noted how the language of a disputed rider was "unnecessarily cumbersome, complex, and hard to read." He wrote: "In order to avoid confusion and litigation of this kind an effort should be made to simplify the language of insurance contracts so that they may be more readily understood by the average purchaser." *Id.* While great strides have been made since that time, we can do better. In that light, I advocate that the State Bar of Wisconsin emulate its sister bar in Michigan and give out its own clarity awards. In fact, as did Mr. Hathaway in Michigan, without apparent success, I advocate that the trial lawyers association and the civil defense lawyers association be part of the committee that determines these awards. Maybe that would help spur a Plain English movement in the writing of policies.